[PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 19-10332

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

REGINALD GRAHAM,
a.k.a. The Real Rico,
a.k.a. To Cool Rico,
a.k.a. G'Rico Longllive Kingsqueezer,
a.k.a. Reggie,
ANTONIO GLASS,
a.k.a. ntn_1bloodgangsta@yahoo.com,
a.k.a. Tone Bleedin Red (Tone Gone Bag'em),
a.k.a. Money Man Future @ S16_Future,
a.k.a. smackvilletone,
a.k.a. Tone Glass,

a.k.a. (at)tone.glass,

JERIMAINE BRYANT,

a.k.a. RNS DSBF Capo,

a.k.a. (at) d5bf_mc,

a.k.a. Blood @_McMaine06,

a.k.a. Maine,

MARIO RODRIGUEZ,

a.k.a. "Blood",

a.k.a. "str8_crackk",

a.k.a. "Tuti",

TORIVIS REGINALD INGRAM,

a.k.a. "DSBF Mullet",

MICHAEL WALKER,

a.k.a. Laid Back ManMan,

a.k.a. Baba,

LEVI BRYANT,

a.k.a. Fish,

CURTIS BRYANT,

a.k.a. Snow Luther King Jr.,

a.k.a. Snow Bryant,

a.k.a. Big Momma,

DANIEL JONES,

a.k.a. Dodo,

SAMUEL HAYES,

a.k.a. DSBF Jit,

a.k.a. Nba Flame,

a.k.a. Looney Hoe,

a.k.a. Sammy,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:17-cr-20307-JEM-7

_____

Before WILSON, JORDAN, and BRASHER, Circuit Judges.

JORDAN, Circuit Judge:

*The Wire* is said to be one of best television shows of all time. That is in large part because of its realistic depiction of gang violence in an American city. *See* Emma Jones, *How the Wire Became the Greatest TV Show Ever Made*, BBC (Apr. 13, 2018), https://perma.cc/2V3Q-GYVK; Rob Sheffield, *100 Greatest TV Shows of All Time*, Rolling Stone (Sept. 21, 2016), https://perma.cc/D862-BGDU. This case is about what happens when that fiction becomes reality.

Reginald Graham, Antonio Glass, Jerimaine Bryant, Mario Rodriguez, Torivis Reginald Ingram, Michael Walker, Levi Bryant, Curtis Bryant, Daniel Jones, and Samuel Hayes appeal their convictions and sentences for committing numerous crimes in connection with their membership in a Miami-based gang—the Dub

Street Blood Family or DSBF. For nearly two decades, the gang operated in and tyrannized a community through its drug operations. When narcotics did not prove fruitful enough, its members turned to armed robberies. And when members stepped out of line or rivals encroached on the gang's territory, its members did not hesitate to kill.[1]

The FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the City of Miami Police Department, and the Miami-Dade County Police Department invested considerable resources to investigate the DSBF and take it down. Their collective work culminated in a broad indictment charging the defendants with numerous offenses. Count 1 charged Mr. Graham, Mr. Glass, Jerimaine Bryant, Mr. Rodriguez, Mr. Ingram, Mr. Walker, Levi Bryant, Curtis Bryant, Mr. Jones, and Mr. Hayes with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Count 2 charged the same defendants—along with Latitia Houser, Donzell Jones, and Vencess Toby—with a narcotics conspiracy (to possess 280 grams or more of crack cocaine and marijuana with the intent to distribute) in violation of 21 U.S.C. § 846. The indictment also charged the defendants with numerous substantive offenses.[2]

---

[1] Because three of the defendants share the last name of Bryant, we use their full names or first names where necessary.

[2] Ms. Houser, Donzell Jones, and Mr. Toby were not defendants in the trial we review in this appeal.

After a 38-day trial, a jury found the defendants guilty of many of the charges. A summary of the convictions and the sentences imposed follows:

| Defendant | Counts | Sentence of Imprisonment |
|---|---|---|
| Reginald Graham | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>11 – Attempted Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 846) | 228 months |
| Antonio Glass | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>19 – Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 841(a)(1)) | Life |

| Jerimaine Bryant | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>5 – Possession of Narcotics with the Intent to Distribute (21 U.S.C § 841)<br><br>12 – Possession of Narcotics with the Intent to Distribute (21 U.S.C § 841)<br><br>21 – Possession of Narcotics with the Intent to Distribute (21 U.S.C § 841) | Life |
| Mario Rodriguez | 2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>10 – Possession of a Firearm in Furtherance of Drug Trafficking (18 U.S.C. § 924(c))<br><br>22 – Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 841(a)(1)) | 260 months |

| | | |
|---|---|---|
| Torivis Reginald Ingraham | 2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>22 – Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 841(a)(1)) | 168 months |
| Michael Walker | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>20 – Possession of Narcotics with the Intent to Distribute (21 U.S.C § 841) | 235 months |
| Levi Bryant | 2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>4 – Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 841(a)(1)) | 192 months |

| | | |
|---|---|---|
| Curtis Bryant | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>2 – Narcotics Conspiracy (21 U.S.C. § 846)<br><br>11 – Attempted Possession of Narcotics with the Intent to Distribute (21 U.S.C. § 846) | Life |
| Daniel Jones | 2 – Narcotics Conspiracy (21 U.S.C. § 846) | 235 months |
| Samuel Hayes | 1 – Racketeering Conspiracy (18 U.S.C. § 1962(d))<br><br>15 – Hobbs Act Robbery (18 U.S.C. § 1951(a))<br><br>17 – Hobbs Act Robbery (18 U.S.C. § 1951(a))<br><br>18 – Brandishing a Firearm in Furtherance of a Crime of Violence (18 U.S.C. § 924(c)(1)(A)(ii)) | 334 months |

The defendants now appeal, raising a host of issues. We vacate the Count 1 RICO conspiracy convictions due to the district court's erroneous and wholesale exclusion of the defendants' gang expert and the government's complete failure to brief harmless error, an issue on which it bears the burden. We also vacate the sentence of Mr. Jones due to the improper application of a use-of-violence enhancement. In all other respects, we affirm.[3]

## I. The Evidence at Trial

The government's case was largely based on the testimony of Special Agent Christopher Mayo of the FBI; Sergeant Surami Kelly of the City of Miami Police Department; Special Agent Rosniel Perez of the ATF; Larry Grimes and Vandel Coakley, former members of the DSBF; Ms. Houser, a drug supplier for the DSBF and the ex-girlfriend of one of its members; and Donzell Jones, a local drug dealer who was close to the DSBF. Viewing the evidence in the light most favorable to the government, *see United States v. Scott*, 61 F.4th 855, 863 (11th Cir. 2023), this is generally the story they told.

As early as the year 2000, law enforcement authorities became aware of a group operating out of the South Gwen Cherry housing complex in the Allapattah neighborhood of Miami, Florida. That group called itself the DSBF and its members frequently identified themselves by other monikers such as RNS (Real N**** Shit) and GMT (Get Money Team). Founded by Isaac "Ike"

---

[3] As to any issues not discussed, we summarily affirm.

Thompson, the DSBF had no formal affiliation with the infamous Bloods street gang of Los Angeles but its members considered themselves to be "[E]ast coast" Bloods.[4]

The law enforcement investigation into the DSBF began in earnest in the early 2010s. The DSBF had a chain of command. At the top of the chain was a chief executive of sorts, a position held by men like Mr. Thompson (and then Mr. Glass around 2012). Below him were "Top Smackers" or "TopShottas," high-ranking deputies who were in charge of the daily drug operations. Then came the "L.T.s."—lieutenants who were second in command during drug transactions and typically collected the money and held the drugs and firearms. Although this chain of command became more fluid over time, there was always a designated leader.

The DSBF had an initiation ritual, rules, handshakes, and hand signs. The initiation involved a 31-second display of loyalty, usually consisting of fighting a member or committing an act of violence against outsiders. The 31-second initiation was co-opted from the "Blood code." Once initiated, members had to follow at least two rules: no stealing from the DSBF and no talking to the police. If a rule was broken, an enforcer, like Mr. Rodriguez, would oversee a 31-second punishment.

Only members could perform the DSBF handshake; outsiders who tried using it "could get beat up." The DSBF's hand signs

---

[4] Later in the opinion, we discuss in more detail the government's evidence about the DSBF's association or affiliation with the Bloods.

were intended to symbolize a capital B, a lowercase B, and "East side," for "[E]ast coast" Bloods.

The DSBF was not shy about demonstrating its presence to the outside world. The area around the South Gwen Cherry complex had graffiti tags of the DSBF. And the gang's members tattooed DSBF on their bodies. As self-proclaimed "[E]ast coast" Bloods, the DSBF's members preferred to wear red.

Members frequently boasted of the DSBF on Facebook and disparaged a rival gang, the "13th Avenue Gang." In a message that proved prescient, a friend of the DSBF warned Mr. Graham: "[D]on't put that DGMT shit on you all [Facebook] status. Feds watching that shit yeah."

Through 2017, the DSBF primarily sold crack cocaine and marijuana, but its members regularly worked together to commit other crimes such as armed robberies. The group's members were no strangers to violence. Members touted firearms and used them—killing rival gang members and "outsiders" such as Pooh Johnson, Richard Hallman, and Terrell Washington. They sometimes even shot their own members for violating the DSBF's rules.

The DSBF's criminal activities fell under three broad categories: (1) drugs; (2) armed robberies; and (3) homicides. We briefly summarize each of them.

**Drugs**. The DSBF controlled the sale of drugs—primarily crack cocaine and marijuana—in the South Gwen Cherry complex. Narcotics were the group's financial engine, and many of the decisions were driven by this reality. Only DSBF members could sell

at South Gwen Cherry, and they did so "[e]very day" in shifts. Out-siders like Donzell Jones had to obtain permission to sell drugs there. Ms. Houser testified that starting in 2015 she began supply-ing the DSBF—through Mr. Glass, Quincy Bryant, Mr. Graham, and Mr. Walker—with the drugs the gang sold at South Gwen Cherry. She also said that Jerimaine Bryant supplied drugs to the DSBF.

Mr. Coakley testified that when it came to selling drugs, "everyone had a position." At the bottom of the rung were "watch outs," members who would alert the group if they saw rivals or police in the area. Members could graduate from a "watch out" to a "bomb man," a position which required them to hold the drugs. They also had a "gunman," which, as one would expect, was a member who had a firearm to protect the group.

Mr. Grimes described how a typical narcotics transaction would be conducted. The DSBF would have at least a watch out and a bomb man. The drugs would be in a nondescript bag ("the bomb") like a trash bag or a chip bag. When a customer requested drugs, the bomb man would take the cash and walk over to set "the bomb." He would then go back to the customer to deliver the drugs. Sgt. Kelly similarly described the drug transactions from her team's controlled purchases.

During Mr. Grimes' time with the DSBF, sometime in late 2010, Mr. Glass was the L.T. who ran the daily drug operations. Mr. Glass would collect the money, assign shifts, and provide the drugs and guns.

In addition, Mr. Grimes gave the jury insight into the finances of the DSBF's narcotics operations. A "rock" of crack cocaine sold for $5, and his commission was 20%. On a good day, Mr. Grimes would pocket $500, and on a bad day $250. He estimated that, on average, the DSBF sold 21 grams of crack cocaine daily. Like all markets, however, the drug sales would sometimes be up and other times be down. Starting in 2016, sales were down. The DSBF's drug operation dried up significantly; supply was unreliable, and the buyers stopped coming. So, like any other market actor, the DSBF decided to diversify its operations to tap other income streams. That meant turning to robberies.

**Armed Robberies**. The jury learned of the DSBF's armed robberies mostly through Mr. Grimes, who in response to defense counsel's questioning stated, "I'm a robber." Mr. Grimes testified that he was arrested for four robberies, but had committed over 25 robberies; at some point he stopped counting. Mr. Grimes' first robbery with the gang dated to his initiation into the DSBF in 2010, when he and Mr. Glass (and others who are not defendants here) attempted to rob a drug dealer. During that attempted robbery, Mr. Grimes fired a gun provided to him by Mr. Rodriguez to show that they "ain't to be played with and we going to shoot."

Following his first robbery in 2010, Mr. Grimes consistently committed armed robberies with the DSBF ("[m]ainly every day"). He identified Mr. Hayes as one of the gang members who frequently joined him in those endeavors. The firearms for the robberies were provided by Messrs. Rodriguez and Glass.

Mr. Coakley testified to his participation in four armed robberies in the fall of 2016 with other DSBF members—Mr. Hayes, Mr. Glass, Mr. Graham, and Curtis Bryant. The government introduced security footage from each of the victimized establishments and Mr. Coakley walked the jury through each robbery.

On September 17, 2016, Mr. Coakley, Mr. Glass, Mr. Graham, and Curtis Bryant robbed a Metro PCS store near South Gwen Cherry at gun point. Less than a week later, Messrs. Coakley and Hayes robbed the same store. In October of 2016, Messrs. Coakley, Hayes, and Glass robbed a nearby convenience store. That same month, Messrs. Coakley and Hayes again robbed the Metro PCS store. In all four robberies, the members held up the store clerk at gun point. And sometimes they held customers hostage. After each robbery, the members involved would split the proceeds evenly.

**Homicides**. The jury heard testimony about the DSBF's killing of Mr. Johnson, Mr. Hallman, and Mr. Washington. All three men were murdered for crossing the gang. Mr. Glass killed Mr. Johnson in 2010 for robbing from the DSBF; Mr. Grimes, Mr. Coakley, and Ms. Houser all testified about that murder. Curtis Bryant killed Mr. Hallman in 2015 after he shot a younger DSBF member; Mr. Coakley and Ms. Houser testified about that murder. Several DSBF members, including Mr. Glass and Curtis Bryant, killed Mr. Washington in 2016; Mr. Coakley, Ms. Houser, and Detective Roderick Passmore testified about that murder.

The DSBF's violence did not stop with outsiders.  For example, Mr. Glass shot Mr. Grimes in a drive-by shooting for violating the DSBF's rules; he had robbed a customer and that was bad for business.

The narcotics, the robberies, and the murders all shared one thing in common—firearms.  Guns were used to sell drugs, to rob, and to kill.  The DSBF's members frequently posted pictures on social media with their guns—sometimes pointing them directly at the camera.  Mr. Coakley testified that he had seen Mr. Rodriguez and Mr. Glass supply weapons, including handguns and semi-automatic rifles, to DSBF members at South Gwen Cherry.

## II. Pre-Trial Issues

The defendants raise various challenges to the district court's pre-trial orders, *voir dire* findings, evidentiary rulings, jury instructions, and sentencing determinations.  A number of defendants also take issue with the sufficiency of the evidence against them on some of the charges.  We address the issues presented in rough chronological order.

### A. Count 2 of the Indictment

We begin with Levi Bryant.  For the first time on appeal, he challenges the sufficiency of Count 2 of the indictment.[5]

---

[5] Mr. Ingram, Mr. Walker, and Jerimaine Bryant adopted Levi Bryant's challenge to Count 2.  *See* Fed. R. App. P. 28(i).

Where a defendant did not raise an issue below, we conduct plain error review. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731–37 (1993). Plain error requires a defendant to show (1) that there was an error, (2) that the error is plain, and (3) that the error affected his substantial rights. *See United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015). If these three conditions are satisfied, we have discretion to correct the error. We "should correct a forfeited plain error that affects substantial rights if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 137 (2018) (citation and internal quotation marks omitted).

As relevant here, Count 2 of the indictment charged a number of defendants, including Levi Bryant, with conspiracy to possess 280 grams or more of crack cocaine (and marijuana) with the intent to distribute. *See* 21 U.S.C. § 846. Numerous other counts individually or jointly charged different defendants with substantive narcotics offenses, such as possession of a controlled substance with the intent to distribute. *See* 21 U.S.C. § 841(a)(1).

According to Levi Bryant, the § 846 conspiracy charged in Count 2 required a "linked" substantive § 841 violation. In his view, because Count 2 in part alleged a conspiracy involving in part 280 grams or more of crack cocaine, the government was required to allege that at least one of the substantive § 841 violations involved 280 grams or more of crack cocaine. But a substantive offense and a conspiracy to commit that offense are separate and

distinct crimes. *See Callanan v. United States*, 364 U.S. 587, 593 (1961) (citing *Pinkerton v. United States*, 328 U.S. 640, 643 (1946)). They may therefore be separately and independently charged, and the government is not required to "link" them in the charging instrument. *See United States v. Shabani*, 513 U.S. 10, 11 (1994) (holding that § 846 does not require proof that "a coconspirator committed an overt act in furtherance of the conspiracy").

As we explained decades ago, a conspiracy "is not confined to the substantive offense which is the immediate aim of the enterprise" because "the essence of the crime of conspiracy . . . is an agreement to commit an unlawful act." *United States v. Cowart*, 595 F.2d 1023, 1030 (5th Cir. 1979). As a result, Levi Bryant cannot establish a defect in the indictment. There was no error, plain or otherwise, in the drafting of Count 2.

### B. The Motions to Suppress

The district court denied the motions to suppress filed by Messrs. Jones, Ingram, and Rodriguez. They challenge those denials on appeal.

We review the denial of a motion to suppress under a mixed standard. We review factual findings for clear error and the application of the law to those facts *de novo*. *See United States v. Ford*, 784 F.3d 1386, 1391 (11th Cir. 2015).

### 1. Mr. Jones

We begin with Mr. Jones. He sought to suppress his cell phone and all evidence associated with it on the grounds that (1)

he was illegally detained during a traffic stop and (2) the phone was seized without probable cause.

A magistrate judge held an evidentiary hearing at which Sgt. Kelly and Agent Perez testified.  Following that hearing, the magistrate judge recommended that Mr. Jones' motion be denied because the officers' search was incident to a lawful arrest.  The district court then adopted the magistrate judge's recommendation. We find no error in the district court's factual findings or legal conclusions and affirm the denial of Mr. Jones' motion to suppress.

The Fourth Amendment protects individuals from unreasonable searches and seizures.  *See* U.S. Const. Amend. IV.  "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant."  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception—which the district court held applied here— is when a warrantless search occurs incident to a lawful arrest.  *See id*.

We must first determine whether there was a lawful arrest. Mr. Jones contends that he was not under arrest, and that even if he was, no probable cause supported the arrest.

The detention here "was in important respects indistinguishable from a traditional arrest." *See Dunaway v. New York*, 442 U.S. 200, 212 (1979). The record shows that Mr. Jones was pulled over and asked to step out of his car, but was not "questioned briefly where he was found." *See id*. Instead, he was put in handcuffs, placed in the back of a police car, transported to the police station, and taken to an interrogation room. Sgt. Kelly's and Agent Perez's subjective beliefs that Mr. Jones was not under arrest or that he went to the police station "voluntarily"—while handcuffed in the back of a police car—do not control. *See id*. *See also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221–22 (11th Cir. 1993) ("The character of a seizure as arrest or *Terry* stop depends on the nature and degree of intrusion, not on whether the officer pronounces the detainee 'under arrest.'"). Mr. Jones was practically and legally under arrest when he was handcuffed and taken to the police station in a police car.

Having determined that Mr. Jones was under arrest, we now ask whether his arrest was supported by probable cause. Probable cause exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation omitted). *See also District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (explaining that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity") (citation omitted).

The magistrate judge—whose report the district court adopted—identified two bases which established probable cause for the arrest.  The first was that Mr. Jones was driving an unregistered vehicle in violation of Fla. Stat. § 320.02, a second-degree misdemeanor punishable by up to 60 days of imprisonment.  *See State v. Brooks*, 295 So. 3d 348, 350, 352–53 (Fla. 2d DCA 2020) (reversing the trial court's suppression of a firearm because the officers seized it incident to a lawful arrest for driving an unregistered vehicle); Fla. Stat. § 320.57(1) (making a violation of § 320.02 a second-degree misdemeanor and referencing statutes setting the available punishments).  Second, Mr. Jones was involved in the RICO and narcotics conspiracies.  We agree with the first basis and therefore do not address the second.

Mr. Jones does not dispute that he *could have* been arrested for driving an unregistered vehicle.  Indeed, he does not challenge the validity of the initial stop for that infraction.  He instead argues that he was not arrested for doing so because he was given two traffic citations.  But, as we have explained, Mr. Jones was in fact under arrest for purposes of the Fourth Amendment when he was handcuffed, placed in the back of a police car, and taken to the police station.  Nor does it matter under the Fourth Amendment that the officers could have issued traffic citations rather than execute an arrest.  *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's

protections.").  Accordingly, the officers had probable cause to arrest Mr. Jones for driving an unregistered vehicle in violation of Florida law.

Having confirmed the existence of an arrest supported by probable cause, we turn to whether the search of Mr. Jones was incident to a lawful arrest.  Simply put, "a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person[.]"  *Davis v. United States*, 564 U.S. 229, 232 (2011).  This exception exists in part to prevent the concealment or destruction of evidence.  *See United States v. Robinson*, 414 U.S. 218, 226 (1973).  And the Supreme Court has permitted the seizure of a cell phone for that purpose while a warrant is obtained for a search of its contents.  *See Riley*, 573 U.S. at 388.

An officer retrieved Mr. Jones' cell phone during a pat down following his detention and arrest.  According to Agent Perez, cell phones hold evidentiary value as the mediums of narcotics transactions because they contain communications with customers and suppliers and, as relevant here, photographs that are used for social media posts.  Mr. Jones' cell phone therefore had independent evidentiary value and was properly seized to prevent the concealment or destruction of evidence it may have contained.  *See United States v. Bragg*, 44 F.4th 1067, 1071 (8th Cir. 2022) ("Bragg's iPhone was seized incident to his lawful arrest. . . . Because a seizure is generally less intrusive than a search, the Supreme Court 'has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a

warrantless search . . . would have been held impermissible.'") (quoting *Segura v. United States*, 468 U.S. 796, 806 (1984)); *Andersen v. DelCore*, 79 F.4th 1153, 1166 (10th Cir. 2023) ("So long as an officer has probable cause that a cell phone contains evidence of a crime, he may seize the phone without a warrant if a reasonable officer would conclude that the seizure is necessary to prevent the destruction of evidence.").  Consequently, the district court did not err in denying Mr. Jones' motion to suppress the cellphone and the evidence associated with it.[6]

### 2.  MESSRS. INGRAM AND RODRIGUEZ

We move on to Messrs. Ingram and Rodriguez.  They sought to suppress (1) evidence seized during an initial warrantless search of a carport connected to their residence and (2) additional evidence subsequently seized from their residence pursuant to a search warrant, as fruits of the poisonous tree of the initial warrantless search.  The district court denied the motions to suppress, ruling that the initial warrantless search and seizure did not violate the Fourth Amendment and so there was no basis to suppress the fruits of that initial search.

### a.  THE CARPORT

---

[6] Mr. Jones also challenges Agent Perez's delay in obtaining a warrant to search the phone.  Mr. Jones raised this argument below, but the magistrate judge did not address it in his report.  Mr. Jones, in turn, did not object to the magistrate judge's failure to address this argument and therefore waived the right to challenge this aspect of the denial of his motion to suppress on appeal.  *See* 11th Cir. R. 3-1.

The home and its surrounding curtilage are constitutionally protected areas, and warrantless searches of them are "presumptively" unreasonable. *See Brigham City*, 547 U.S. at 403. But officers may "ent[er] upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006). This so-called knock-and-talk exception is limited in two respects. First, when an officer's behavior "objectively reveals a purpose to conduct a search," the exception ceases. *See United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015). Second, an officer is "geographically limited to the front door or a 'minor departure' from it." *Id.*

Mr. Ingram and Mr. Rodriguez contend that Miami-Dade Police Detectives Terrence Andre White and Charles Woods exceeded the scope of the knock-and-talk exception when they approached the carport. We disagree.[7]

The behavior here did not objectively reveal a purpose to search. Detectives White and Woods went to the residence upon belief that Mr. Rodriguez, who was wanted for questioning in connection with a homicide, was present there. Upon arriving at the residence, the Detectives saw Messrs. Ingram and Rodriguez sitting under the carport. So the Detectives walked through the open gate

---

[7] The government concedes on appeal that the carport was part of the curtilage.

to talk to them.  This conduct fell squarely within the knock-and-talk exception.

Moreover, approaching the carport did not exceed the geographic limit of the knock-and-talk exception.  As in *Walker*, the carport here was open-aired and attached to the side of the home. *See Walker*, 799 F.3d at 1363–64 (carport was a "minor departure" from the front door because it "was located right next to the house").  And in seeing the two men under the carport, the Detectives could forego the formality of knocking on the front door.  *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (recognizing that the knock-and-talk exception allows an officer to do "no more than any private citizen might do").  Accordingly, the Detectives acted within the scope of the exception.

Additionally, because the Detectives' presence at the carport was lawful, the arguments of Messrs. Ingram and Rodriguez concerning evidence seized from the carport fail.  That evidence consisted of narcotics and a firearm that Mr. Ingram grabbed from a table and attempted to conceal.  Because those items were in plain view, they were subject to seizure without a warrant.  *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.").

**b. THE STATEMENTS**

When Mr. Rodriguez saw Detective Woods approaching the carport, he attempted to flee and was apprehended by Detective White. He challenges the voluntary statements he made after his arrest as obtained in violation of the Fourth Amendment, and argues that his subsequent waivers of his *Miranda* rights could not cure any such violation. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).[8]

Mr. Rodriguez is correct that *Miranda* warnings cannot "alone and per se" break "the causal connection between [any] illegality and" his voluntary statements. *See Brown v. Illinois*, 422 U.S. 590, 603 (1975). But, as noted above, there was no Fourth Amendment violation by Detectives White and Woods. As a result, Mr. Rodriguez's statements were not subject to exclusion as fruits of the poisonous tree. *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).

In sum, we find no error in the district court's denial of the motions to suppress filed by Messrs. Ingram and Rodriguez.

## C. THE MOTION TO SEVER

Jerimaine Bryant contends that the district court erred in denying his motion to sever. We disagree.[9]

---

[8] Mr. Rodriguez does not independently challenge the sufficiency of the *Miranda* warnings or his waiver of his rights.

[9] Mr. Graham, Mr. Walker, Mr. Glass, Mr. Jones, and Levi Bryant adopted Jerimaine Bryant's severance argument. Such an adoption, however, is inappropriate. Severance is a fact-specific and defendant-specific inquiry that requires independent briefing. *See United States v. Hankton*, 51 F.4th 578, 609 n.17

We review a district court's denial of a motion to sever for abuse of discretion. *See United States v. Lopez*, 649 F.3d 1222, 1235–36 (11th Cir. 2011). "The burden of establishing an abuse of discretion" on the issue of severance "rests with [the defendant]." *United States v. De La Torre*, 639 F.2d 245, 249 (5th Cir. 1981).

If joinder appears prejudicial, a defendant can move for a severance. *See* Fed. R. Crim. P. 14(a). The Supreme Court has explained that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Considering that guidance, we have set out a general rule that "defendants who are indicted together are usually tried together." *Lopez*, 649 F.3d at 1234 (citing *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007)). The rule applies with some force in conspiracy cases: defendants in such cases "should be" tried together. *See id.* (citation omitted).

A defendant seeking severance "must discharge the heavy burden of demonstrating compelling prejudice from the joinder." *Browne*, 505 F.3d at 1268 (citation and internal quotation marks omitted). To prove compelling prejudice, a defendant must show (1) that actual prejudice would result from a joint trial and (2) that

---

(5th Cir. 2022) ("'[U]nder Rule 28(i), severance issues are fact-specific' and thus cannot be adopted by co-defendants.") (citation omitted). In any event, we reject Jerimaine Bryant's severance argument.

severance is the only proper remedy to avoid that prejudice. *See Lopez*, 649 F.3d at 1234.

The indictment charged Jerimaine Bryant with both conspiracies—the Count 1 RICO conspiracy and the Count 2 narcotics conspiracy. There was a strong presumption, therefore, in favor of jointly trying him with the other defendants who were similarly charged. *See id. See also United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) ("A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants.").

Jerimaine Bryant argues that because his conduct was limited to narcotics possession and distribution, severance was warranted due to prejudicial "spillover" evidence concerning homicides. To remedy that issue, however, the district court instructed the jury to consider the case of each defendant separately and individually. We have explained that such an instruction "significantly alleviat[es]" the "possible prejudicial effects" of joinder. *See Smith*, 918 F.2d at 1510. Here that instruction apparently did its job; the jury acquitted some defendants, such as Levi Bryant and Mr. Jones, of several charges. By Jerimaine Bryant's own admission, a jury instruction like the one given plus a discriminating verdict signals that the jury followed those instructions and was able to sift through the evidence without undue influence from any potentially inflammatory spillover. *See United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997).

Moreover, the evidence Jerimaine Bryant complains of was not spillover evidence.  For example, one of the racketeering acts charged in the RICO conspiracy was the murder of Mr. Johnson.  And the government presented evidence that Jerimaine Bryant was a senior member of the DSBF who advised Mr. Glass to kill Mr. Johnson.  The district court did not abuse its discretion in denying the severance motion.

## III. Jury Selection

At jury selection, the district court denied the defendants' *Batson* challenges, finding that the government had legitimate, non-discriminatory reasons for exercising six of its eight peremptory strikes on prospective Black jurors.  *See generally Batson v. Kentucky*, 476 U.S. 79 (1986).  Levi Bryant contends that the district court's rulings were erroneous, but we are not persuaded.[10]

### A. *Batson*

The Supreme Court has established a three-part inquiry for evaluating a claim that a peremptory strike is racially discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the

---

[10] Jerimaine Bryant, Curtis Bryant, Mr. Ingram, and Mr. Walker adopted Levi Bryant's *Batson* arguments.

parties' submissions, the trial court must determine
whether the defendant has shown purposeful dis-
crimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (citing *Batson*, 476
U.S. at 96–98).[11]

Only step three of that sequence is in dispute here.  At step
three, "[i]f a race-neutral explanation is tendered, the trial court
must . . . decide . . . whether the opponent of the strike has proved
purposeful racial discrimination."  *Johnson v. California*, 545 U.S.
162, 168 (2005) (citation omitted).  In other words, "[t]he ultimate
inquiry is whether the [government] was 'motivated in substantial
part by discriminatory intent.'"  *Flowers v. Mississippi*, 588 U.S. 284,
303 (2019) (citing *Foster v. Chatman*, 578 U.S. 488, 513 (2016)).

At step three, "the district court's determination concerning
the actual motivation behind each challenged strike amounts to
pure factfinding, and we will reverse only if the decision is clearly
erroneous."  *United States v. Walker*, 490 F.3d 1282, 1291 (11th Cir.
2007).  The district court's determination is understandably entitled
to "great weight."  *Davis v. Ayala*, 576 U.S. 257, 285–86 (2015).  And
"[a] finding that is 'plausible' in light of the full record—even if an-
other is equally or more so—must govern."  *Cooper v. Harris*, 581
U.S. 285, 293 (2017) (citation omitted).

---

[11] *Batson* also applies to discriminatory strikes based on gender, but such strikes
are not at issue here.  *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).

The district court's perception of an attorney's credibility can be critical at step three, and can be measured by, among other things, "how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339. Other relevant factors at step three include (1) "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;" (2) "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;" (3) "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;" (4) "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;" and (5) "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers*, 588 U.S. at 302.

## B. Prospective Jurors 15, 19, 84, and 103

The government used six of its peremptory strikes on prospective Black jurors. But Levi Bryant challenges as racially motivated only the strikes against Jurors 15, 19, 84, and 103.[12]

To establish discriminatory intent, Levi Bryant relies on statistical evidence, the government's alleged misrepresentations to

---

[12] During the *Batson* hearing, defense counsel conceded that the government appropriately struck Juror 44, a prospective Black juror. The government struck Juror 85, another prospective Black juror, because he was young, familiar with the South Gwen Cherry area, and self-reported that he was being investigated by his employer.

the district court during the *Batson* hearing, and comparisons of prospective Black jurors who were struck to non-Black jurors who were not struck. We address each type of evidence in turn but ultimately consider the evidence cumulatively. *See Flowers*, 588 U.S. at 314 (stating that the evidence relevant to the issue of discriminatory intent "cannot be considered in isolation" and a court "must examine the whole picture").

## 1. STATISTICAL EVIDENCE

Looking first at the numbers, the parties narrowed the pool to 36 prospective jurors, 13 of whom were Black (either African-American, Jamaican, or Bahamian). After the parties exercised their peremptory strikes, four members of the 12-person petit jury were Black. To get there, the government used six of its eight peremptory strikes on prospective Black jurors. The government had additional preemptory strikes that it could have, but did not, use. The defense, in turn, used three preemptory strikes on prospective Black jurors. The government attempted to accommodate two other prospective Black jurors—Jurors 57 and 146—but the district court struck them for cause.[13]

On at least two occasions, we have found that a similar pattern of strikes did not indicate discrimination. *See United States v.*

---

[13] Juror 57 had started a new job and was concerned that she would not be paid during a lengthy trial. The government proposed having the district court inform her employer about of the prohibition on discriminating based on jury duty. Juror 146 had a real estate licensing exam scheduled during the trial. The government proposed taking a day off on the date of his exam.

*Dennis*, 804 F.2d 1208, 1210–11 (11th Cir. 1986) (no *Batson* violation where the jury included two Black jurors and the government used three of eight peremptory strikes on prospective Black jurors and an alternate but had four unused challenges); *United States v. Campa*, 529 F.3d 980, 998 (11th Cir. 2008) (no *Batson* violation where the government chose not to use two of its peremptory strikes and the jury included three Black jurors and an alternate Black juror). Under these cases, the statistical evidence here is not so suggestive of discriminatory strikes so as to render the district court's findings clearly erroneous.

### 2. THE GOVERNMENT'S REASONS

We next examine the race-neutral reasons proffered by the government. The government took some liberties in describing some of the prospective Black jurors' answers, but its descriptions were not a "series of factually inaccurate explanations" that necessarily signaled discriminatory intent. *See Flowers*, 588 U.S. at 314. The district court's findings that the government's stated reasons were race neutral and supported by the record, *see* D.E. 1201 at 32, were plausible and therefore not clearly erroneous.

**Juror 15.** Levi Bryant's strongest argument concerns Juror 15. As relevant here, Juror 15 was unsure whether she could properly judge the testimony and credibility of a cooperating witness, so she left blank the two corresponding questions on the jury questionnaire. The district court attempted to clarify her position, but she essentially provided a nonanswer: she "[j]ust didn't think of it at the time." D.E. 1198 at 49–50. Upon further questioning, she

said that she was capable of being impartial to cooperating wit-
nesses.  The government struck her because it believed that her
failure to answer only those two questions on the questionnaire
indicated that "it was something she just didn't want to commit
to," and when she answered the district court's questions, she did
so "equivocally."  By equivocal, it meant that her answers were
"'maybe, I don't know, I guess I could,' they were not clear, unam-
biguous answers of 100% yes. . . . It was not patently clear for us
that these cooperating witnesses . . . would not be a potential prob-
lem for her."  D.E. 1201 at 9–10.

        Juror 15 did not say exactly what the government claimed.
But as to her initial answers, it was not "patently clear" what her
position was on cooperating witnesses—it took the district court
several attempts to clarify her position.  So, although the govern-
ment's explanation to the district court was not entirely accurate,
"mistaken explanations should not be confused with racial discrim-
ination."  *Flowers*, 588 U.S. at 314.  The government was free to
conclude that Juror 15's initial reticence to answer the two ques-
tions reflected her true feelings and that, in turn, that she merited
a peremptory strike.  *Cf. Harper v. Lumpkin*, 64 F.4th 684, 696–97
(5th Cir. 2023) (rejecting a defendant's *Batson* argument that a pro-
spective juror was "not being untruthful or deceptive by failing to
respond to one of the items on the questionnaire": "[T]his argu-
ment does nothing to demonstrate that the prosecutor's stated rea-
son was pretextual. Both things can be true: [the juror] could have
been fully truthful and forthcoming, and the prosecutor could have

been concerned that she failed to respond to one of the most important items on the questionnaire.").

The government also struck Juror 15 due to her exposure to the criminal justice system. She had a nephew who had been arrested or convicted and she failed to clarify whether she believed he had been treated fairly.

At the end of the day, the district court's finding as to Juror 15—that the government exercised a race-neutral strike—was not clearly erroneous, even when taking into account the statistical evidence.

**Juror 103.** As to Juror 103, Levi Bryant claims that an admitted misstatement by the government—that Juror 103 (rather than her husband) was on hemodialysis—was an attempt to misrepresent the record. But the district court did not clearly err in viewing the government's misstatement as just a mistake.

The bottom line is that Juror 103 was the primary caretaker for her son, who is disabled, and for her husband, who was on hemodialysis awaiting a kidney transplant. In the government's view, this was "an unpredictable family health situation that would have been a disruption for the trial." D.E. 1201 at 25. The district court plausibly found that the government's strike of Juror 103 was race-neutral, even when the statistical evidence is considered.

**Juror 84.** Levi Bryant next argues that the government made material misrepresentations with respect to Juror 84. He challenges the government's proffer of a quote from Juror 84 that she "didn't trust the system." L. Bryant Br. at 31. It is true that

Juror 84 did not utter those exact words.  But in commenting on her son's reckless driving charge, she stated that it "took a lot out of our lives," and she believed that the charges were excessive and likely financially motivated.  *See* D.E. 1198 at 122–23.  Those comments—particularly her belief that the severity of her son's charges was "a money making thing"—could fairly be characterized as a distrust of the system.  *See id.*  The district court's finding that the government's strike of Juror 84 was not racially motivated, even considered in light of the statistical evidence, was plausible and therefore not clearly erroneous.

In addition, Levi Bryant challenges the government's claim that Juror 84 had an "inability to judge [a] cooperating witness."  L. Bryant Br. at 31 (quoting D.E. 1201 at 12).  This too was not a material misrepresentation.  Juror 84 believed that it was improper for cooperating witnesses to receive lesser sentences and did not know if she could trust their testimony.  She would not automatically discredit such testimony, but the fact that a witness cooperated "might influence [her] decision."  D.E. 1198 at 124.  Her perspective clearly evinced some possible doubt about cooperating witnesses.  Though her statements would not have merited being removed for cause, the district court was entitled to find that the government was justified in striking her.  *See United States v. Hill*, 31 F.4th 1076, 1082 (8th Cir. 2022) (explaining that a prospective juror's inability to consider the testimony of a cooperating witness constitutes a "race-neutral reason" for a peremptory strike); *United States v. Thomas*, 315 F. App'x 828, 834 (11th Cir. 2009) (concern that prospective jurors "might question the veracity of a cooperating co-

defendant's testimony" constituted a race-neutral reason for use of peremptory strikes).[14]

### 3. COMPARATOR EVIDENCE

As the final piece of his *Batson* claim, Levi Bryant attempts to infer discriminatory intent by comparison.

Starting with the government's peremptory strike of Juror 19, Levi Bryant's argument is unpersuasive. The government struck Juror 19 because she had served on a hung jury, raising concerns of her indecisiveness. This was a race-neutral reason. *See United States v. Hernandez-Garcia*, 44 F.4th 1157, 1167 (9th Cir. 2022) ("Ms. Del Rosario's prior service on a hung jury was a legitimate reason [for the use of a peremptory strike.]"); *United States v. Rudas*, 905 F.2d 38, 41 (2d Cir. 1990) ("Aponte's service on a hung jury was a legitimate reason for striking him.").

Levi Bryant counters that this reason was pretextual because the government did not strike two prospective non-Black jurors who also had prior jury service. But those two comparators served on juries which returned verdicts. Juror 19 was struck not because she served on a jury, but because of her jury's inability to reach a verdict. The comparison therefore misses the mark.

As another point of comparison, Levi Bryant identifies two prospective non-Black jurors who, like Juror 19, had negative

---

[14] *Thomas* is an unpublished decision, but we find it persuasive on this point.

experiences with the legal system but whom the government did not strike.  Those jurors, however, also did not sit on hung juries.

In sum, none of the prospective non-Black jurors identified by Levi Bryant shared the totality of Juror 19's circumstances.  He therefore cannot show, by way of comparison, that the district court clearly erred in finding that government's use of a peremptory strike on Juror 19 was race-neutral.  *See United States v. Stewart*, 65 F.3d 918, 926 (11th Cir. 1995) ("We recognize that failing to strike a white juror who shares some traits with a black juror does not itself automatically prove the existence of discrimination.").

### 4. FAMILIARITY WITH SOUTH GWEN CHERRY

Finally, Levi Bryant argues that the government's consideration of any prospective juror's familiarity with the South Gwen Cherry complex was inherently discriminatory towards prospective Black jurors because it is located in a predominantly Black neighborhood.  But "[a]n argument relating to the impact of a classification does not alone show its purpose." *Hernandez v. New York*, 500 U.S. 352, 362 (1991).

Familiarity with the South Gwen Cherry complex was just one factor considered by the government, as it did not seek to exclude any prospective Black juror solely on that basis.  And a juror's familiarity with—and thus potential bias for or against—the particular geographic setting of a case (and the defendants who hail from that area) can be a legitimate reason for the use of a peremptory strike.  *See Hollingsworth v. Burton*, 30 F.3d 109, 113 (11th Cir. 1994) ("Studmire's close connection to the area in which the crime was

committed is highly relevant. Living and carpooling in the area created both an increased risk of familiarity with the scene of the crime and a heightened likelihood of being subjected to conversations relating to the crime.").

The district court found that a "small town familiarity with a particular area is racially neutral." D.E. 1201 at 18. Without definitive evidence that the government adopted this criterion with the intent of excluding Black jurors, the district court did not clearly err in finding that any disparate impact "[did] not violate the principle of race neutrality." *Hernandez*, 500 U.S. at 362. *See also Flowers*, 588 U.S. at 302–03. The district court could have viewed the record differently, but it was not compelled to do so.

### 5. SUMMARY

The individual components of Levi Bryant's *Batson* claim fall short. Taken collectively, they also do not show that the district court clearly erred in finding that the government was not "motivated in substantial part by discriminatory intent" in striking Jurors 15, 19, 84, and 103. *See Flowers*, 588 U.S. at 303.

### IV. THE EVIDENTIARY RULINGS AT TRIAL

The defendants challenge a number of evidentiary rulings by the district court. Where an objection was properly preserved, we generally review such rulings for an abuse of discretion. *See Fid. Interior Constr., Inc. v. S.E. Carpenters Reg'l Council*, 675 F.3d 1250, 1258 (11th Cir. 2012). This standard "recognizes the range of possible conclusions the [district court] may reach." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

We will not disturb an evidentiary ruling unless there is a "clear error of judgment." *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994). Of course, the district court also "abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). "So [if] we conclude that the district court erred, we mean to say that the district court abused its discretion in one of these ways." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1296 (11th Cir. 2022).

## A. RULE 801(d)(2)(E)

Our first look at the evidentiary rulings starts with Mr. Rodriguez, whom the district court treated as a member of the two charged conspiracies. He claims that this was error, and that as a result the district court improperly admitted against him the statements of purported co-conspirators. *See* Fed. R. Evid. 801(d)(2)(E). The statements at issue were made by Messrs. Walker and Graham, and also include those statements contained in Summary Exhibit 303, which was a compilation of thousands of social media posts by the purported co-conspirators.

Mr. Rodriguez sought to exclude the statements through a motion in limine. The district court denied the motion without prejudice and advised Mr. Rodriguez to reassert the objection at trial should the government seek to introduce the co-conspirators' statements. There is no indication in the record, however, that Mr. Rodriguez argued inadmissibility under Rule 801(d)(2)(E) at trial, and he does not cite to any such objection. Mr. Rodriguez thus

failed to preserve the issue, which means that our review is for plain error. *See* Fed. R. Evid. 103(b) ("Once the court rules *definitively* on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.") (emphasis added); *United States v. Feldman*, 936 F.3d 1288, 1300 (11th Cir. 2019) ("Because the magistrate judge did not make a definitive ruling on the extrapolation issue, Mrs. Feldman was required to object to Dr. Chaitoff's statement to avoid plain error review."). *Accord United States v. Broussard*, 87 F.4th 376, 379 (8th Cir. 2023) (explaining that a denial of motion in limine accompanied by an invitation to reassert the objection at trial is not a "definitive" ruling that preserves an issue for appeal).[15]

We find no plain error in the district court's admission of the co-conspirators' statements against Mr. Rodriguez. "For a co-conspirator statement to be admissible under [Rule 801(d)(2)(E)], the government must show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Hough*, 803 F.3d 1181, 1193 (11th Cir. 2015). Contrary to Mr.

---

[15] Mr. Ingram, in the table of contents and summary of the arguments of his brief, also appears to argue that the district court erred in admitting the hearsay statements of purported co-conspirators. But he does not cite any authority in support of this point. Nor does he devote a discrete section of his argument to this contention. His failure to adequately brief the issue constitutes abandonment. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

Rodriguez's contention, Rule 801(d)(2)(E) does not require "substantial independent evidence" of a conspiracy. *See* M. Rodriguez Br. at 44. When preliminary facts relevant to determining the admissibility of evidence—such as co-conspirator statements—are disputed, the relevant standard of proof is a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). A preponderance of the evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *United States v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (citation omitted).

The testimony of Mr. Grimes, a former short-lived DSBF member and unindicted co-conspirator, was enough to establish Mr. Rodriguez's participation in the RICO and narcotics conspiracies by a preponderance of the evidence. Mr. Grimes testified that, when he became a member of the DSBF around 2010, Mr. Rodriguez was one of the first people he met in the gang. Mr. Rodriguez was introduced to him as "Blood"—an awfully suspicious nickname considering the gang was called the Dub Street Blood Family. During his relatively short tenure with the DSBF, Mr. Grimes frequently hung out with Mr. Rodriguez, including at the latter's home. He knew Mr. Rodriguez as the point man for all gang rules violations and initiations, and as someone who occasionally supplied the gang (and himself) with guns. Mr. Rodriguez also sold crack cocaine. He had his own clientele, but would step in when the DSBF ran out of inventory. As Mr. Grimes testified, if Mr. Rodriguez had not been a DSBF member, the gang would not have tolerated him selling drugs at the South Gwen Cherry complex.

Had Mr. Rodriguez challenged at trial the admission of co-conspirator statements against him, Mr. Grimes' testimony would have satisfied the district court under *Bourjaily*. *See, e.g., United States v. Amede*, 977 F.3d 1086, 1094–95, 1098 (11th Cir. 2020). Accordingly, Mr. Rodriguez's unpreserved, non-specific challenge to the Rule 801(d)(2)(E) evidence fails. The district court did not plainly err.

### B. Rule 804(b)(3)

Levi Bryant argues that the district court should not have admitted Jerimaine Bryant's social media post (which implicated Levi) under the hearsay exception for statements against interest. *See* Fed. R. Evid. 804(b)(3). We are not persuaded.

Rule 804(b)(3) permits the admission of an out-of-court statement when (1) it is against the penal interest of the declarant, (2) corroborating circumstances exist indicating the trustworthiness of the statement, and (3) the declarant is unavailable. *See United States v. Harrell*, 788 F.2d 1524, 1526 (11th Cir. 1986). The statement must be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).[16]

As we have explained, Rule 804(b)(3) encompasses more than "direct confessions of guilt," and includes "remarks that a

---

[16] Levi Bryant concedes that Jerimaine Bryant was unavailable as a witness.

reasonable person would have realized strongly implied [the declarant's] personal participation in the relevant crime . . . [and] disserving statements by a declarant that would have probative value in a trial against the declarant." *Chiquita*, 47 F.4th at 1308 (citation and internal quotation marks omitted). Whether a "statement is self-inculpatory or not can only be determined by viewing it in context [and] . . . in light of all the surrounding circumstances." *Williamson v. United States*, 512 U.S. 594, 603–04 (1994). And whether a statement is genuinely against a declarant's penal interest is a question of law we review *de novo*. *See United States v. Costa*, 31 F.3d 1073, 1077 (11th Cir. 1994).

Levi Bryant is the uncle of Jerimaine Bryant, who refers to Levi as "Fish." On Facebook, Jerimaine posted the following: "My uncle fish gave me the game, my Aunte Danielle showed me the way, and ma n****s got me this far." Anticipating that the government would use this statement to suggest that he taught Jerimaine the "drug game," Levi moved to exclude the statement as inadmissible hearsay. *See* D.E. 1202 at 103. In response, the government argued that the post was a statement against Jerimaine's interest— "that he's been taught a drug game" by Levi. *See id.* at 104.

The district court admitted the Facebook post, concluding that Jerimaine was "admitting complicity." *Id.* Though the depth of this analysis may not have been to Levi's liking, the district court considered the parties' arguments and made a ruling on a matter of law, that is, whether the statement was against Jerimaine's penal

interest.  *See Costa*, 31 F.3d at 1077.  Under the circumstances, no exhaustive factual explanation was necessary.[17]

The focus of our inquiry is on whether the statement "when made . . . had so great a tendency to . . . expose the declarant to . . . criminal liability" that a reasonable person in his position would not have made the statement unless he believed it was true.  *See* Fed. R. Evid. 804(b)(3)(A).  We have described this as an "expansive test."  *United States v. Alvarez*, 584 F.2d 694, 700 (5th Cir. 1978).

It is true that there is nothing facially self-inculpatory about Jerimaine's Facebook post.  According to the post, Levi "gave" him "the game," but we do not know from the post itself what that means.  As defense counsel argued in closing, "the game" could refer to an activity like gambling.  *See* D.E. 1229 at 201–02.  *See also* The American Heritage Dictionary of the English Language 720 (5th ed. 2011) (defining "game").

But a "facially neutral statement[ ] might actually be against a declarant's interest."  *United States v. Thomas*, 62 F.3d 1332, 1337 (11th Cir. 1995) (citing *Williamson*, 512 U.S. at 603).  And a statement's context elucidates its meaning.  *See, e.g., United States v. Hammers*, 942 F.3d 1001, 1010–11 (10th Cir. 2019) (the "context and the circumstances" under which statement was made include the declarant's state of mind and other statements and actions

---

[17] During her testimony, Sgt. Kelly did exactly what Levi had predicted.  She testified that "the game" likely meant "narcotics sales."  D.E. 1203 at 71–72.  And in its closing argument, the government argued that "[t]he game is drugs."  D.E. 1231 at 47.

accompanying the statement); *United States v. Awer*, 770 F.3d 83, 94 (1st Cir. 2014) (analyzing a purportedly self-inculpatory statement in the context in which it was made, rather than in conjunction with other similar statements made by the defendant); *United States v. Gupta*, 747 F.3d 111, 128–29 (2d Cir. 2014) (looking to the declarant's conduct when the statement was made). We turn, therefore, to context.

The first important piece of context is that Levi was a known drug dealer by the time of Jerimaine's Facebook post in 2015. Between 2006 and 2012, Levi was arrested four times for selling drugs, and two of those arrests resulted in convictions. And Mr. Coakley identified Levi as being one of the DSBF's earliest members, selling drugs as early as 2001. The post therefore had a tendency to implicate Jerimaine (the declarant) in Levi's narcotics activities and the drug business. *See Williamson*, 512 U.S. at 603–04 ("'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy."). Moreover, Ms. Houser and Mr. Coakley identified Jerimaine as a crack cocaine supplier for the DSBF. So both Levi and Jerimaine were involved in the narcotics trade at the time of Jerimaine's Facebook post. A reasonable person in Jerimaine's position would have made the statement only if he believed it to be true because it had a tendency to expose him to criminal liability.

This is not one of those instances in which a declarant's implication of a co-defendant is suspect because it might be an

attempt to shift blame or curry favor—the statement here does not accomplish those ends. *See Williamson*, 512 U.S. at 603–04; *Costa*, 31 F.3d at 1078. Given that Levi was a known drug dealer and a member of the DSBF, and that Jerimaine was known to supply drugs to the DSBF, the district court did not err in concluding that "the game" was drug dealing.

Jerimaine's statement in the Facebook post was also supported by corroborating circumstances that clearly indicated its trustworthiness. There was plenty of evidence implicating Jerimaine in the drug conspiracy. And there is no obvious reason why he would have fabricated his business relationship with Levi. *See United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1209 (11th Cir. 2009).

We therefore conclude that Jerimaine's Facebook post was properly admitted against Levi under Rule 804(b)(3).[18]

## C. Rule 801(d)(1)(B)

Mr. Graham argues that the district court erred in allowing the government to introduce, as a prior consistent statement,

---

[18] We reject the argument made by Levi that admitting Jerimaine's Facebook post violated his rights under the Confrontation Clause of the Sixth Amendment. *See generally Crawford v. Washington*, 541 U.S. 36, 51 (2004). Simply put, Jerimaine could not have reasonably anticipated that a social media post, made years before his arrest, would be used in court. The statement is therefore nontestimonial and the Confrontation Clause does not apply. *See United States v. Hano*, 922 F.3d 1272, 1287 (11th Cir. 2019) (explaining that "the threshold question in every case" raising a confrontation issue "is whether the challenged statement is testimonial") (citation omitted).

portions of an audio recording in which Donzell Jones, a cooperating witness, implicated Mr. Graham in a robbery. We disagree.

Under Rule 801(d)(1)(B), a prior consistent statement by a witness is not hearsay if (1) the declarant testifies and is subject to cross-examination on the statement; and (2) the statement is consistent with the declarant's testimony and is offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." A district court may exclude those parts of a prior consistent statement that do not relate specifically to matters on which the declarant was impeached, but "it is not required to do so." *United v. Brantley*, 733 F.2d 1429, 1438 (11th Cir. 1984). "A district court is granted broad discretion in determining the admissibility of a prior consistent statement under Fed. R. Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." *United States v. Prieto*, 232 F.3d 816, 819 (11th Cir. 2000).

When cross-examining Donzell Jones, defense counsel impeached him using an audio recording of his interrogation by two agents. On redirect, the government played other portions of that recording to rehabilitate him. Some portions of the interrogation played by the government apparently implicated Mr. Graham in a robbery. *See* D.E. 1114 at 51–56 ("[The government is] presenting evidence against Reginald Graham now by saying that [they] did robberies together.").

The record, however, is silent as to what the recording actually says. *See, e.g., id.* at 50 ("Audio playing."). And because it was

impeachment evidence, neither party entered Donzell Jones' inter-rogation transcript into evidence. Mr. Graham, moreover, did not provide us with a copy on appeal. *See* Fed. R. App. P. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence rel-evant to that finding or conclusion."); *Selman v. Cobb Cnty. Sch. Dist.*, 449 F.3d 1320, 1333 (11th Cir. 2006) ("[T]he burden is on the appellant to ensure the record on appeal is complete, and where a failure to discharge that burden prevents us from reviewing the dis-trict court's decision we ordinarily will affirm the judgment."). Given the incomplete record before us, our review of this issue is constrained.

There is no dispute that the recording satisfied the first re-quirement of Rule 801(d)(1)(B). Defense counsel used a portion of it during Donzell Jones' cross-examination. As to whether the gov-ernment properly offered it to rebut defense counsel's express or implied charge that Donzell Jones was not credible and/or had an improper motive in testifying as a cooperating witness, Mr. Gra-ham argues that Rule 801(d)(1)(B) limits the scope of rehabilitation to the precise issues on which defense counsel impeached Donzell Jones. This broad legal assertion, however, is contrary to our prec-edent. *See Brantley*, 733 F.2d at 1438. The scope of the govern-ment's use of the recording was within the discretion of the district court, and we are reticent to disturb its decision given the limited record before us.

In any event, the record indicates that the government did not exceed the scope of the impeachment of Donzell Jones. Defense counsel cross-examined him on his prior statements, including purported lies about his involvement with a group of individuals which included several alleged DSBF members, his knowledge of certain gang members, and his knowledge of robberies that gang members had participated in. *See* D.E. 1113 at 17–20; D.E. 1114 at 21–24. On redirect examination, the government offered as a prior consistent statement another segment of the recording where Donzell Jones apparently admitted to knowing of the gang's robberies. This was an express rebuttal of defense counsel's cross examination and, as far as we can tell, fell directly within the purview of Rule 801(d)(1)(B). Accordingly, we conclude that the district court did not abuse its discretion in allowing the government to rehabilitate Donzell Jones with his prior consistent statements.

## D. LIMITS ON THE CROSS-EXAMINATION OF AGENT PEREZ

Mr. Walker argues that the district court denied him his Sixth Amendment right to confront witnesses by improperly limiting his cross-examination of Agent Perez. This argument lacks merit.

A district court generally has discretion to limit the scope of cross-examination, subject of course to the requirements of the Sixth Amendment. *See United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994). The Sixth Amendment confers on a defendant the right to cross-examine a witness to expose motivation and bias, but the right is not unlimited. *See Delaware v. Van Arsdall*, 475 U.S. 673,

678–79 (1986). It "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, once a party has had that opportunity, further questioning is generally within the district court's discretion. *See Garcia*, 13 F.3d at 1468. The question is "whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.* at 1469.

Mr. Walker contends that the district court should not have precluded him from further cross-examining Agent Perez about a undercover narcotics buy on May 3, 2017. According to Mr. Walker, this buy was a last-ditch effort by the authorities to obtain direct evidence of him selling crack cocaine mere days before the indictment was returned.

The problem for Mr. Walker is that Agent Perez did not testify on direct examination about the buy on May 3, 2017. In fact, he explained—both on direct and cross-examination—that he participated as part of the surveillance team for undercover narcotics buys in the South Gwen Cherry complex only in 2016. *See, e.g.,* D.E. 1222 at 160 (Agent Perez: "The May 3rd [drug buy] I was not involved in it." Defense Counsel: "All right. [W]ere you involved in any of Detective Quintero's attempts to purchase narcotics?" Agent Perez: "The ones in 2016, yes."). The district court therefore did not abuse its discretion or violate Mr. Walker's Sixth

Amendment rights by limiting Mr. Walker's cross-examination of Agent Perez on a matter in which he was not involved.

In any event, Mr. Walker did ask Agent Perez some questions about the May 3, 2017, buy and the indictment, and his general authority over the timing of the controlled buys. He even attempted, among other things, to undermine the circumstantial evidence of his participation in drug sales by questioning Agent Perez on the slang terms in certain Facebook posts. Accordingly, Mr. Walker had ample opportunity to—and did—thoroughly cross-examine Agent Perez, such that additional questioning on the buy on May 3, 2017, would not have impacted the latter's credibility.

The district court did not abuse its discretion, and did not violate Mr. Walker's Sixth Amendment rights, in limiting the cross-examination of Agent Perez.

### E. Rule 801(d)(2)(B)

Curtis Bryant argues that the district court erred in admitting his "giggle and smirk" reaction to a co-conspirator's statement as an adoptive admission of his participation in a murder under Rule 801(d)(2)(B). The issue is close, but the abuse of discretion standard calls for rejection of the argument.

Mr. Coakley, a cooperating and unindicted co-conspirator, testified that after the shooting of Mr. Hallman, a rival gang member, Jerimaine Bryant announced that "momma got his feet wet." According to Mr. Coakley, "Momma" referred to "Big Momma," Jerimaine's nickname for his brother Curtis Bryant, and "got his

feet wet" meant "you shot somebody." In response to Jerimaine's statement, Curtis Bryant started "giggling."

When a statement is offered as an adoptive admission under Rule 801(d)(2)(B), the district court generally must determine as a preliminary matter whether (1) "the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond," and (2) "there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Carter*, 760 F.2d 1568, 1579 (11th Cir. 1985). We review a district court's rulings under Rule 801(d)(2)(B) for abuse of discretion. *See United States v. Joshi*, 896 F.2d 1303, 1312 (11th Cir. 1990).

We have affirmed the admission of non-verbal reactions like silence and a head-nod as adoptive admissions. *See Carter*, 760 F.2d at 1579–80, 1580 n.5 (the defendants' silence in the back seat of a vehicle while the front seat passenger made incriminating statements about their drug smuggling activities); *Joshi*, 896 F.2d at 1311–12 (the defendant's head nod in response to a statement introducing him and describing his role in a narcotics conspiracy). We discern no abuse of discretion in the district court's decision to admit Jerimaine Bryant's giggle.

The first criterion for admission under Rule 801(d)(2)(B) is particularly important when dealing with adoptive admissions by silence. *See United States v. Santos*, 947 F.3d 711, 724 (11th Cir. 2020). But if the defendant affirmatively responded to the statement—like by nodding, *see Joshi*, 896 F.2d at 1311–11, or by

giggling, as is the case here—the "focus is on the second criterion." *Santos*, 947 F.3d at 724.

Under the second criterion, we conclude there is sufficient evidence in the record from which the jury could infer that Curtis heard and acquiesced in Jerimaine's statement. Mr. Coakley testified that Jerimaine told him—in the presence of Curtis—that "momma got his feet wet." He also explained that "momma" referred to Curtis and getting "his feet wet" meaning shooting someone. Curtis giggled in response. Laughter, as an affirmative act, can be stronger evidence of adoption than silence. *See Carter*, 760 F.2d at 1579–80. Given the stark contrast between the gravity of the misconduct—a murder—and the tenor of the response, the giggling here was at least as strong as, if not stronger than, the assent of a head nod. *See Joshi*, 896 F.2d at 1311–12.[19]

Concerning comprehension, Curtis points out that there is no direct evidence that *he* necessarily shared Mr. Coakley's understanding of Jerimaine's statement. To attempt to reconstruct that understanding, we break down the statement into two constituent

---

[19] In response to Curtis' hearsay objection at trial, the district court explained that the second criterion for admission under Rule 801(d)(2)(B) is "really an issue for the jury." That was only half right. It is true that the "ultimate determination of foundational prerequisites for adoptive admissions is for [the] jury." *Joshi*, 896 F.2d at 1312. But as an initial matter the district court must make a preliminary finding that the "jury could reasonably find that the defendant comprehended and acquiesced in the statement." *Id.* Doing otherwise "needlessly risks the possibility of reversal if the evidence is subsequently found to have been erroneously admitted." *Id.*

parts: (1) the identity of "momma" and (2) the action of getting one's "feet wet." As to the former, Curtis would have known his brother's nickname for him, and he does not dispute this fact. As to the latter, Curtis is correct that we only know for certain how Mr. Coakley understood the statement. But we are reviewing for abuse of discretion, and admissibility does not require absolute certainty. Given his reaction, the district court could find that Curtis understood a slang term used by a family member. Any ambiguity in the statement went to weight, not admissibility. And defense counsel had the opportunity to expose any ambiguity in Mr. Coakley's cross-examination.

This issue presents a close question, but given our precedent and the discretion afforded a district court on evidentiary matters, affirmance is in order. *See Frazier*, 387 F.3d at 1259 (the abuse of discretion standard "recognizes the range of possible conclusions the [district court] may reach"). The district court did not abuse its discretion in admitting Curtis' giggle in response to Jerimaine's statement as an adoptive admission under Rule 801(d)(2)(B).

## F. Other Acts Evidence

Messrs. Hayes and Ingram challenge the admission of certain "other acts" evidence under Rules 404(b) and 403. Their pretrial motion to exclude this evidence below was struck as untimely. At trial, the district court denied Mr. Hayes' objection on the merits because "[t]he subject activity [was] evidence of the racketeering activity." D.E. 1201 at 29–30.

The problem for Messrs. Hayes and Ingram is that they have failed to properly and sufficiently brief this issue on appeal. Before trial, the government notified the defendants that it intended to introduce numerous "other acts" against them—at least nine against Mr. Hayes and eight against Mr. Ingram. *See* D.E. 444. But on appeal, Messrs. Hayes and Ingram do not tell us with sufficient specificity what "other acts" were actually and improperly introduced against them at trial; for what purpose those "other acts" were presented; and when during the trial those "other acts" were introduced. Mr. Hayes tells us only that the "other acts" introduced against him were acts of "mugging, auto theft, fleeing and eluding, possession of firearms, *etc*." S. Hayes Br. at 40 (emphasis added). He argues that those acts were too far removed in time from the Hobbs Act robberies to be probative of intent. Mr. Ingram is even less helpful. He simply tells us that the district court erred in admitting his "co-appellants' prior arrests" and an arrest or conviction of his (we don't really know which) for "possession with intent to sell controlled substance." T. Ingram Br. at 55, 57.[20]

To properly present an issue on appeal—especially one arising from a multi-defendant trial lasting almost 40 days—it was incumbent on Messrs. Hayes and Ingram to identify exactly the evidence they now challenge. *See Sapuppo*, 739 F.3d at 681. We

---

[20] Mr. Hayes describes the "other acts" evidence with more specificity in his reply brief, but that comes too late. *See United States v. Levy*, 379 F.3d 1241, 1242–43 (11th Cir. 2004).

decline to sift through a transcript of nearly 8,000 pages to figure out and resolve their arguments.

### G. Rule 615(a)

Jerimaine Bryant and Mr. Glass argue that the district court erred by excluding the testimony of a defense witness for violating the rule of sequestration. *See* Fed. R. Evid. 615 (2018). We agree that the district court erred.

### 1. Ms. Bryant

The witness at issue was Tracy Bryant, the sister of Jerimaine, Quincy, and Curtis Bryant and a relative of several other defendants. She also happened to be the former girlfriend of a government witness, Mr. Coakley, with whom she has five children.

At the start of the trial, defense counsel invoked the rule of sequestration. And following an evidentiary hearing, the district court excluded the proffered testimony of Ms. Bryant for her violation of the rule.

Outside of the jury's presence, Ms. Bryant explained that, prior to trial, the defense did not ask her to testify and she apparently had no interest in doing so. She did, however, want to observe the trial. She showed up for *voir dire* but was placed in an overflow courtroom with a malfunctioning closed-circuit television, got bored, and left. She returned a second time, sat through some of Sgt. Kelly's testimony, again got bored, and left. As relevant here, she heard no testimony about Mr. Johnson or his murder. But afterwards she received a call from a friend who told her

that Mr. Coakley had testified that Mr. Glass murdered Mr. Johnson. This prompted her third visit to the trial, this time to watch Mr. Coakley testify, and she again left without hearing anything about Mr. Johnson. She then changed her mind about testifying. She decided she would testify and contacted the defense because she believed that Mr. Coakley had lied about Mr. Johnson's murder.

As she detailed in her proffered testimony, Ms. Bryant and Mr. Coakley had been in a relationship for about 11 years and had five children together. At the time of Mr. Johnson's murder, she lived in the South Gwen Cherry complex with her grandmother, mother, two sisters, and of her two brothers, Jerimaine and Quincy Bryant.

Ms. Bryant testified to where she and Mr. Coakley were on the night Mr. Johnson was killed. She explained that she and Mr. Coakley were together in bed watching a movie at her apartment on the night of the murder. She heard two sets of shots, sitting up for the first set and slouching for the second set. Mr. Coakley remained asleep during both sets of shots. She then went to the balcony, where she saw people running towards a clothing line but could not see Mr. Johnson. She returned and woke Mr. Coakley, who was sick with a stomach virus, to tell him of the shooting.

Mr. Coakley ran out the front door wearing red shorts and socks, returning to put shoes on before going back out. Ms. Bryant followed him and went to the clothing line. She did not see Mr. Coakley, Mr. Glass, Curtis Bryant, or Quincy Bryant during the 10

minutes she was there. When she returned home, Ms. Bryant found her brother Quincy on the couch. He did not appear to be out of breath, sweating, or to have exerted himself.

According to Ms. Bryant, this series of events lasted 15 minutes. She did not testify, however, as to where Mr. Coakley went or when he returned.

## 2.  The Rule of Sequestration

District courts have broad discretion to sequester witnesses before, during, and after their testimony. *See Geders v. United States*, 425 U.S. 80, 87 (1976). At the time of trial, Rule 615 provided that, at a party's request, a district court "must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony."[21]

The two purposes of excluding prospective witnesses from trial are to prevent them from tailoring their testimony to that of earlier witnesses and to facilitate the exposure of false testimony and other credibility problems. *See Geders*, 425 U.S. at 87; *Warren*, 578 F.2d at 1076; 29 Victor J. Gold, Fed. Prac. & Pro. Evid. § 6242 (2d. ed. & June 2024 update). When counsel or a witness violates the rule of sequestration, the district court may (1) cite the guilty party for contempt; (2) allow opposing counsel to cross-examine

---

[21] Rule 615 was amended in December of 2023. The new Rule 615(a) operates only to exclude witnesses from the courtroom, while the new Rule 615(b) allows district courts to enter orders prohibiting disclosure of trial testimony to witnesses and/or prohibiting excluded witness from accessing the trial testimony.

the witness as to the nature of the violation; or (3) in the case of an intentional violation that results in actual prejudice, strike testimony already given or disallow further testimony. *See United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir. 1983).

A violation of the rule of sequestration does "not . . . require the automatic exclusion of testimony[.]" *United States v. Warren*, 578 F.2d 1058, 1076 (5th Cir. 1978). Excluding a witness' testimony is a "serious sanction." *Id.* at 1327. In all but the most egregious cases, cross-examination ordinarily has the "curative aspect" of empowering the jury to evaluate the violating witness' credibility. *See United States v. Eyster*, 948 F.2d 1196, 1211 (11th Cir. 1991). *See also Holder v. United States*, 150 U.S. 91, 92 (1893) ("If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely, although the right to exclude under particular circumstances may be supported as within the discretion of the trial court."); *United States v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997) ("Because exclusion of a defense witness impinges upon the right to present a defense, we are quite hesitant to endorse the use of such an extreme remedy."); *United States v. Walker*, 613 F.2d 1349, 1355 n.11 (5th Cir. 1980) ("failure of a witness to comply with the sequestration rule does not of itself render his testimony inadmissible"). A district court "ordinarily will not exclude witnesses without a demonstration of probable prejudice." *Warren*, 578 F.2d at 1076 n.16.

The district court called Ms. Bryant's conduct "among the more egregious violations of the [r]ule of [s]equestration." D.E. 1227 at 32. Reviewing for abuse of discretion, we do not disturb the district court's finding of a violation. We have held that a witness violates a Rule 615 sequestration order by reading the testimony of other witnesses. *See, e.g., United States v. Jimenez*, 780 F.2d 975, 980 n.7 (11th Cir. 1986) ("Reading prior trial testimony violates [a Rule 615] sequestration order."). Being told of another witness' testimony is not too far removed from the reading of testimony.

Nevertheless, the district court erred in excluding Ms. Bryant as the remedy for the violation. As indicated earlier, ordinarily a district court will not exclude a witness absent a showing of probable prejudice to the other side. *See Warren*, 578 F.2d at 1076 n.16. The district court never made a finding that the government would likely suffer prejudice if Ms. Bryant were allowed to testify. Indeed, the government did not claim prejudice below and does not argue prejudice on appeal.

### 3. Prejudice

We now address whether Jerimaine Bryant and Mr. Glass were prejudiced by the district court's error. As previously noted, Ms. Bryant would have testified as to where she and Mr. Coakley were on the night of Mr. Johnson's murder—specifically that he was asleep wither her in bed when the shots rang out and that she woke Mr. Coakley to inform him. That testimony, if believed, would have undermined the testimony of Mr. Coakley that he witnessed Mr. Johnson's murder.

Jerimaine Bryant argues that he would have received some general benefit from Ms. Bryant weakening Mr. Coakley's overall credibility. But Jerimaine Bryant was not implicated in the murder of Mr. Johnson, and as a result his generalized allegations are insufficient to establish the requisite prejudice. *See, e.g., Warren*, 578 F.2d at 1076. He therefore has not shown prejudice from the exclusion of Ms. Bryant.

The person most affected by Ms. Bryant's exclusion was Mr. Glass, whom Mr. Coakley explicitly incriminated in Mr. Johnson's murder. But Mr. Coakley was not the only one to point the finger at Mr. Glass for the killing. Mr. Grimes testified that other DSBF members teased Mr. Glass about him murdering Mr. Johnson. Ms. Houser, a crack cocaine supplier for the DSBF and a cooperating witness, testified that she saw Mr. Glass shooting over a wall at Mr. Johnson. She also heard Quincy Bryant and Mr. Glass discussing the murder. Ms. Bryant's testimony may have cast doubt on Mr. Coakley's version of events, but it would not have impeached Mr. Grimes or Ms. Houser. Given this additional evidence about Mr. Glass killing Mr. Johnson, it is not apparent that the exclusion of Ms. Bryant's testimony prejudiced Mr. Glass. *See Untied State v. Irving*, 665 F.3d 1184, 1209–10 (10th Cir. 2011) (holding that the district court's error in excluding a defense witness due to a violation of the sequestration rule was not prejudicial in part because there was "substantial, independent evidence" on the disputed issue at trial). But because we vacate all of the Count 1 RICO conspiracy convictions on another ground, we need not make any definitive pronouncements on prejudice to Mr. Glass.

## H. Sgt. Kelly & Agent Perez: Part 1

The government tendered Sgt. Kelly and Agent Perez as lay witnesses who could provide certain opinions based upon their training and expertise. *See, e.g.,* D.E. 1202 at 31. Messrs. Graham, Walker, and Hayes argue that the district court erred in permitting them to offer improper dual-capacity testimony as both lay and expert witnesses.

### 1. Rules 701 and 702

"The Federal Rules of Evidence distinguish between lay and expert opinion testimony." *United States v. Gbenedio,* 95 F.4th 1319, 1332 (11th Cir. 2024). Rule 702 generally permits opinions by qualified experts based on "scientific technical, or other specialized knowledge." Under Rule 701, lay opinion testimony must, among other things, be "rationally based on the witness'[ ] perception" and cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

"The distinction sometimes blurs when [the] testimony is based on professional work." *Gbenedio,* 95 F.4th at 1332. For example, just "because an expert could provide the type of testimony at issue, [that does not mean] a lay witness cannot." *United States v. Novaton,* 271 F.3d 968, 1008 (11th Cir. 2001) (applying pre-2000 version of Rule 701). *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.,* 320 F.3d 1213, 1223 n.17 (11th Cir. 2003) (explaining that *Novaton* remains good law after the 2000 amendment to Rule 701). Nor does "the lay opinion of a law enforcement official automatically become [ ] an expert opinion simply because it

involves knowledge that preexisted the investigation in the present case." *United States v. Williams*, 865 F.3d 1328, 1342 (11th Cir. 2017).

We "examine the basis of an opinion to determine whether it is lay or expert." *Gbenedio*, 95 F.4th at 1332. When a witness testifies in a dual capacity, i.e., as both a lay witness and an expert witness, the district court must ensure that the lay opinions satisfy Rule 701 and that the expert opinions satisfy Rule 702. "[P]roper lay testimony [can be] rendered improper by the indiscriminate merging of fact testimony with expert testimony" while the witness is "on the . . . stand." *United States v. Hawkins*, 934 F.3d 1251, 1266 (11th Cir. 2019) (holding that it was plain error to allow a police officer to testify both as lay witness—on matters like his interpretation of drug codes and jargon—and as an expert witness—on matters like interpreting conversations and drawing inferences from them as a whole, describing how cocaine is "cooked," and providing an overview of the evidence—without demarcation).

Together, Sgt. Kelly and Agent Perez constituted an important part of the government's case. Sgt. Perez testified for three days and Agent Perez for nine. We discuss their testimony separately, starting with Sgt. Kelly.

## 2. Sgt. Kelly

At the time of trial, Sgt. Kelly had been investigating gangs in Miami for five years. *See* D.E. 1032 at 25. She had attended three courses on gangs (basic, intermediate, and advanced) offered by the Florida Department of Law Enforcement and had taken classes on how to use social media for investigations. *See* D.E. 1203 at 42–43.

And in the course of her work she had met with and talked to over 50 gang members. *See* D.E. 1204 at 31. With respect to her investigation of the DSBF, she conducted surveillance at the South Gwen Cherry complex, was involved in some controlled purchases of narcotics, used informants, reviewed surveillance videos from pole cameras, and engaged in a review of the defendants' social media activity. *See, e.g.,* D.E. 1202 at 26–33.

During her direct examination, and without any objections, Sgt. Kelly testified about or opined on a number of subjects. These included the nicknames of some of the defendants (e.g., Mr. Graham's username on a social media account was "G'Rico Long Live King Squeezer"); the meaning of terms like "4-20" (a marijuana special for $200 on April 20), "code red" (police in the area), "top-shotta" (a leader or someone who is on top), "whip" (a car), "trap" (the place where narcotics are kept and sold), "opp" (rival gang), "jitt charges" (juvenile charges), and "broom" (a gun); and the interpretation or meaning of certain gang signs. *See* D.E. 1203 at 14; D.E. 1202 at 47, 51, 53–54, 73, 76, 93–94, 99, 109, 114.

The first defense objection under Rule 702 to Sgt. Kelly's testimony was to a question about the meaning of the term "crabs." *See* D.E. 1202 at 127–28. After the government went over Sgt. Kelly's training and experience, the defense objected again on Rule 702 grounds. *See id.* at 130. The district court overruled the objection, explaining that "it was up to the jury to decide" and that it was "not a gatekeeper in this area any longer. I think the rules have changed." *Id.* at 130–31. The district court then explained,

however, that "[t]he question [was] whether [Sgt. Kelly's] experience qualifie[d] her to explain what certain words mean in this context, and I think that goes to the weight of it." *Id.* at 131.

After this exchange, Sgt. Kelly testified that "crabs" "usually means Crips." She also explained that "OTF" means "only the family." *Id.* at 132, 134.[22]

With respect to Sgt. Kelly, we see no reversible dual-capacity error.

First, aside from the two answers described above, Sgt. Kelly's opinions on nicknames, the meaning of terms used by the defendants, and gang signs came in without any objections. That means we review the admission of those opinions for plain error, *see United States v. Wetherald*, 636 F.3d 1315, 1320 (11th Cir. 2011), and there is no error that is plain given our precedent permitting lay opinion testimony on similar subjects by law enforcement officers with sufficient experience. *See, e.g., Novaton*, 271 F.3d at 1009 (agents who monitored wiretaps testifying about code words); *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) (FBI agent testifying about code words, nicknames, references, and interpretations of calls and communications).

Second, as to the two opinions to which objections were preserved—that "crabs" "usually means 'Crips'" and that "OTF"

---

[22] There was also a defense objection when Sgt. Kelly was asked to opine about the meaning of the term "jump." The objection was overruled, but Sgt. Kelly ultimately did not give an opinion. *See* D.E. 1202 at 100.

means "only the family"—we conclude that the district court initially erred in stating that it did not have the role of gatekeeper. As our cases explain, the district court must ensure that expert testimony under Rule 702 does not come in under the guise of lay opinion testimony under Rule 701. *See Hawkins*, 934 F.3d at 1265–66. And in order to carry out this task, the district court must indeed act as a gatekeeper. Otherwise, dual-capacity opinion testimony may prove problematic. *See, e.g., United States v. Dulcio*, 441 F.3d 1269, 1274 (11th Cir. 2006) ("We agree that it is error to admit opinion testimony of lay witnesses based upon specialized knowledge, such as [testimony by an agent on the modus operandi of people involved in the drug business].").

Nevertheless, the district court also explained that the question was whether Sgt. Kelly, by virtue of her experience, could provide a lay opinion on a given subject. And given her experience in gang investigations, her work in this case, and her review of the defendants' voluminous social media activity, allowing Sgt. Kelly to opine on the meaning of "crabs" and "OTF" was not an abuse of discretion. *See, e.g., United States v. Wall,* 116 F.4th 1285, 1308 (11th Cir. 2024) (case agents did not violate *Hawkins* by providing "permissible factual or lay opinion testimony tied to the specifics of their investigation"); *Gbenedio*, 95 F.4th at 1333 (DEA agent allowed to opine, based on his personal observations, that the defendant dispensed controlled substances without a legitimate medical purpose and outside the normal course of practice). And even if there was any error, we fail to see how the defendants suffered any prejudice from two opinions on relatively non-important matters.

### 3. Agent Perez

We now turn to Agent Perez.  As with Sgt. Kelly, we will focus on the specific testimony that the defendants challenge on appeal.

At the time of trial, Agent Perez was a special agent in the ATF's Miami field office.  He had served as an agent for eight years and focused on investigating violent crimes, such as robberies, gang activity, arsons, and explosives.  He was the case agent, which meant that he coordinated the various local and federal investigatory resources.  He also executed many of the search warrants used in this case.  *See* D.E. 1114 at 132–34.

Much like Sgt. Kelly, the vast majority of Agent Perez's testimony complained of by the defendants on appeal came in without objection.  For instance, Mr. Graham argues on appeal that Agent Perez provided certain testimony based on his "training and experience" that amounted to improper expert testimony.  *See* R. Graham Br. at 13 (providing a string cite to Agent Perez's testimony).  But based on our review of Mr. Graham's record cites, and those provided by Messrs. Walker and Graham, we conclude that they failed to raise contemporaneous Rule 702 objections.  In fact, in most instances the defendants did not object at all.  *See, e.g.,* D.E. 1114 at 177 ("Q: Based on your training and experience and investigation in this case, what does the phrase 'BLATT' mean?  A: It's also associated with the Blood gang."); *id*. at 201 ("Q: Are you familiar with the phrase 'Blood in and Blood out'?  Do you know

what that means? A: I do, yes.  Q: And what does it mean?  A:  It means that you are a Blood from birth, always.").

Given the lack of contemporaneous objections on Rule 702 grounds, we review for plain error.  *See Wetherald*, 636 F.3d at 1320.  As with Sgt. Kelly, we find no plain error in the district court allowing Agent Perez to testify about the meaning of terms, code words, and other gang-related phrases and actions.  That is because our precedent allows testimony very close to what Agent Perez provided.  *See, e.g., Wall*, 116 F.4th at 1308; *Jayyousi*, 657 F.3d at 1102; *Novaton*, 271 F.3d at 1009.

The only preserved Rule 702 objection was to Agent Perez's testimony explaining why the word "Crazy" was spelled with a "B" instead of a "C."  *See* D.E. 1217 at 85–86 ("A: That's Brazzy.  Q: [I]n the course of this investigation, have you seen . . . the letter B substituted for the letter C?  A: I have.  Q:  And why is that?  A: It's a reference to the Bloods and not wanting the use the word C because it refers to Crips.  [Defense counsel]:  Objection, Your Honor . . . it's calling for his opinion that is not just a lay opinion, but a specialized opinion which he's not qualified for at this point.").

But the district court in effect sustained that objection by requiring Agent Perez to clarify whether, in the course of his investigation, he had seen the defendants switch the letter "B" for "C."  *See id*.  After confirming that he had, the government then asked him whether the defendants had a "common association."  Agent Perez responded, "[y]es . . . [t]hey all subscribe to the Blood gang."  *Id*. at 86.  The defendants' objection to the latter answer was that

Agent Perez improperly drew a "conclusion that is not . . . for him to make at this point." *Id.* at 87. The district court overruled that objection and the testimony continued without further reference to the previously-objected-to "specialized" testimony. We conclude the testimony was permissible because it was based on Agent Perez's investigation in this case. *See, e.g., Novaton*, 271 F.3d at 1009.

In sum, we find no reversible error in the district court's decision to allow Sgt. Kelly and Agent Perez to testify about the defendants' association with the Bloods and the meaning of certain terms and gang-related code words.

## I. Sgt. Kelly & Agent Perez: Part 2

Mr. Hayes raises another plain-error challenge to the testimony of Sgt. Kelly and Agent Perez. He argues that they offered impermissible expert conclusions on the ultimate issue of whether there was a RICO enterprise by referring to the defendants collectively as a "gang" or an "organization." *See* S. Hayes Br. at 10–11.

This argument is misplaced. Even assuming that Sgt. Kelly and Agent Perez provided Rule 702 testimony, experts may testify on ultimate issues so long as they do not opine on the defendants' mental state or condition in a criminal case. *See* Fed. R. Evid. 704(b). *See also United States v. Gryzbowicz*, 747 F.3d 1296, 1310 (11th Cir. 2014) ("[A]n expert may testify as to his opinion on an ultimate issue of fact provided that he does not merely tell the jury what result to reach or testify to the legal implications of conduct.") (citation and internal quotation marks omitted). Because the existence of an enterprise is not a matter involving scienter, *see Boyle v.*

*United States*, 556 U.S. 938, 944–45 (2009) (laying out the "broad" understanding of a RICO enterprise), there was no plain error.

### J. SGT. KELLY & AGENT PEREZ: PART 3

Curtis Bryant challenges some of the testimony of Sgt. Kelly and Agent Perez on separate and unrelated grounds. He argues that there was no evidence that the social media account attributed to him in fact belonged to him. But this is simply not correct. The account, belonging to "Snow Bryant," shared his last name and included multiple photographs of him (several of which were selfies). In the comments to one of the account's posts, another user addressed "Snow" as "Curt" and "Curtis." *See* Gov't Exh. 306 at 6972, 6993–95, 7015, 7065. Accordingly, there was sufficient evidence that the account more likely than not belonged to Curtis Bryant. *See* Fed. R. Evid. 104(b).

In addition, Curtis Bryant contends that the district court should have excluded this social media evidence under Rule 403 as irrelevant and unfairly prejudicial. "Rule 403 'is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility.' . . . The balance to be struck is largely committed to the discretion of the district court[.]" *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (citation omitted).

As the government correctly points out, the account in question contained a significant amount of relevant information. For example, on multiple occasions the owner used the hashtag "GMT," an alternative acronym for the DSBF, and posted pictures

of Mr. Hallman, a rival gang member, including one of him in a casket at his funeral. This was significant because Mr. Coakley offered testimony from which the jury could find that Curtis Bryant killed Mr. Hallman. So did Ms. Houser.

The social media evidence therefore suggested gang affiliation and further tied Curtis Bryant to the homicide of a rival gang member. This evidence was certainly prejudicial to Curtis Bryant, but not in a legally unfair way. On this record, we cannot say that any such prejudice substantially outweighed its probative value. Accordingly, the district court did not abuse its discretion in admitting evidence of the "Snow Bryant" social media account.

## V. THE DEFENSE EXPERT

The district court excluded all of the testimony of a defense gang expert, Dr. Jesse de la Cruz. The defendants challenge his exclusion on appeal.

We review rulings on the admissibility of expert testimony under the abuse of discretion standard. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). This deferential standard gives the district court "'considerable leeway'" in making its evidentiary determinations. *See Frazier*, 387 F.3d at 1258 (quoting *Kumho Tire*, 526 U.S. at 152). We may affirm an evidentiary ruling on any ground supported by the record, even if that ground was not the basis for the district court's ruling. *See In re Int'l Management Assocs. LLC*, 781 F.3d 1262, 1266 (11th Cir. 2015). *See also Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 n.4 (1st Cir. 2012) (applying this principle to the exclusion of expert testimony).

Before summarizing Dr. de la Cruz's proposed testimony, we describe the evidence presented by the government about the DSBF and its affiliation or connection with the Bloods. That evidence will explain the relevance of Dr. de la Cruz's testimony.

### A. THE GOVERNMENT'S GANG AND BLOODS EVIDENCE

Count 1 of the indictment charged the defendants with being members of a RICO conspiracy in violation of 18 U.S.C. § 1962(d). The defendants, according to the government, were part of the DSBF, a criminal gang (an enterprise) which trafficked in narcotics and committed other crimes (like robbery and murder) from 2000 through 2017 out of the South Gwen Cherry complex. *See* D.E. 193 at 2–8.

In its case in chief, the government presented the expert testimony of FBI Special Agent Christopher Mayo. As relevant here, he testified that (1) "an open air drug market" is a place where drug transactions take place outdoors; (2) in South Florida most gangs are community-based, operate by themselves in a geographic area, and are made up of members who grew up in a certain area; (3) "typically" there aren't "nationally-based gangs"; (4) drug organizations usually sell narcotics at retail from a location, or "trap;" (5) drug organizations have individuals performing different functions (e.g., suppliers, lieutenants, sellers, lookouts, etc.); (6) drug organizations also have workers who handle weapons (like firearms) and are in charge of security "in case they're robbed by rival gang members or other drug traffickers;" (7) drug organizations utilize people who will conduct robberies (e.g., of other drug organizations) or

commit homicides; (8) cocaine is a powder and is trafficked from Ecuador through go-fast vessels in the Eastern Pacific and Caribbean, into Mexico and/or the United States; (9) cocaine is cooked with baking soda and water to form cocaine base in a rock-like form; (10) marijuana is grown in South Florida in grow houses and is also imported from Mexico and places like Colorado; and (11) the slang term "dub" refers to 20, as in a "20 piece of cocaine or $20 worth of marijuana." *See* D.E. 1215 at 95–108.

Agent Mayo was not asked about the Bloods, or about whether the defendants were in a gang that considered itself a Bloods gang. Other government witnesses, however, testified extensively about how the DSBF identified itself and considered itself as a Bloods gang.

Sgt. Kelly provided testimony about the Bloods and its connection to the DSBF. She testified that "[t]his gang [the DSBF] identifies themselves as the Bloods." D.E. 1202 at 75. She also explained that a defendant wearing a red bandana was "an indication for Blood[s]" and showed gang members "identifying themselves as Blood[s] members." *Id.* at 96–97. In her experience, the Bloods wear red "most of the time," but "not all the time." D.E. 1203 at 37, 39. When asked about "Tone Bleedin Red," the Facebook name of Mr. Glass, she responded that the name meant "[t]hat he's a Blood, that he's bleeding red for Blood." D.E. 1202 at 99. Similarly, she reviewed a photograph of Jerimaine Bryant and told the jury that he was making a "Blood" sign. *See* D.E. 1203 at 52 ("Usually people that associate themselves with the Bloods . . . they throw

that gang sign."). She said that the "Bloods" and "Crips" are "rivals." D.E. 1202 at 132.

In relatively lengthy exchange with the government, Sgt. Kelly also testified that (1) in South Florida the number one factor to determine gang membership are the "red bandanas;" (2) the two main gang criteria she looks for are "the colors, the red, [and] the hand signs they [are] throwing;" and (3) other criteria are "[h]ow they [the members] call themselves as a group," and whether a person identifies as a member—"Q: What do you think about someone who claims that they're a Blood? A: If they say that, it's because they're Bloods and we usually document it as Blood[s] members." D.E. 1204 at 29–31. *See also* D.E. 1202 at 96–97 ("Q: [W]hat is the significance of the red bandana? A: That's significance [sic] that they [are] actually Blood, that they [are] part of a gang, that they're identifying themselves as Blood members.").

Significantly, Sgt. Kelly also testified about the "connection" between the DSBF and the national Bloods gang. In her opinion, the DSBF was "a subset" of the Bloods. *See* D.E. 1202 at 120.

Like Sgt. Kelly, Agent Perez testified about the affiliation of the DSBF with the Bloods. He explained that the members of the defendants' gang "all subscribe to the Blood gang." D.E. 1217 at 86. He also said that certain words and phrases used by the defendants (and their spellings) were references to the Bloods or their code. *See, e.g.,* D.E. 1218 at 71–75. For example, he told the jury that "based on [his] training and experience" the use of the word "blatt" in some of the defendants' social media posts was

"associated with the gang of the Bloods." D.E. 1220 at 91. *See also* D.E. 1219 at 78 (identifying an exhibit as a "photograph of Jerimaine Bryant displaying the hand sign for Bloods").

The government's evidence about the Bloods gang and its connection to the DSBF was not limited to the testimony of law enforcement officials. Two cooperating witnesses—Messrs. Grimes and Coakley—also testified that the defendants' gang was affiliated with the Bloods. Mr. Grimes told the jury that the DSBF was a "Blood gang" which used an initiation ritual (a 31-second beatdown) that "came from Blood like Blood code," and explained that the members considered themselves East-side Bloods because they were on the east coast. *See* D.E. 1204 at 160–61, 165, 168. Mr. Coakley confirmed the DSBF's affiliation with the Bloods gang. *See* D.E. 1205 at 45, 179, 193. In addition, there was testimony by other government witnesses about the defendants' social media posts, which frequently referenced the defendants' Bloods membership. *See* D.E. 1219 at 39, 68, 75, 77–78, 83–84; D.E. 1221 at 3, 6, 8, 10–12, 14.

## B. Dr. de la Cruz

Dr. de la Cruz holds a bachelor's degree in Sociology with a minor in Deviant Behavior, as well as a master's degree in Social Work. *See* D.E. 1221 at 85. He was a gang member in California in the 1970s and wrote his dissertation about gang members from Stockton who were aligned with the "Norteños." *See id.* at 85–87. He also interacted with members of the Bloods during his own incarceration and during his stint as the director of a program dealing

with parolees who had a high-risk of recidivism. *See id*. at 99–102. He has been qualified to testify as an expert on gang-related matters over 60 times in state and federal courts, and he has served as an expert consultant in over 500 other cases. *See id*. at 102–04. The defendants wanted to call him as a gang expert to explain that the defendants were not members of the Bloods or of a gang and therefore did not constitute a criminal enterprise. *See id*. at 60–61, 67.

In his testimonial proffer outside of the jury's presence, Dr. de la Cruz provided the following opinions after reviewing some of the trial testimony and exhibits: (1) gangs, including the Bloods and the Crips, generally have rules; (2) gangs have leaders and gang members commit crimes for the benefit of the organization; (3) profits are managed by a treasurer; (4) most gangs do not allow members to use drugs, and sometimes punish drug use with death; (5) gangs do not allow members to assault or kill other members without permission; and (6) the defendants were not a gang or criminal enterprise because (a) they were a "bunch of yahoos running around . . . breaking the law with no sense of direction, with no leadership direction," (b) they used drugs, which was inconsistent with the behavior of those in criminal enterprises, (c) they did not get together for meetings to discuss the organization's business, (d) they were "shooting each other indiscriminately," and (e) they did not kill rivals. *See id*. at 90–98. He also opined that the defendants were "not Bloods" because they wore blue instead of red, they attacked each other, and they talked to the police. *See id*. at 102-08. In sum, the defendants did "not meet one of the elements of a criminal enterprise[.]" *Id*. at 108.

During cross-examination in the proffer session, Dr. de la Cruz acknowledged that he was talking about the Bloods in general. He maintained that all of the Bloods gangs were connected under the "People Nation" or "Folk Nation" umbrella, but he had not interviewed any members of the Bloods outside of California or New York/Pennsylvania. *See id.* at 118–19.

## C. DISCUSSION

The district court excluded all of Dr. de la Cruz's testimony on three grounds. First, it ruled that his testimony was not relevant because the government had not tried to connect the DSBF to the national Bloods gang. Second, it believed that one of Dr. de la Cruz's opinions went to the ultimate issue in the case (i.e., whether the defendants formed a criminal enterprise) and thus was not properly "the subject of expert testimony." Third, it concluded that Dr. de la Cruz was not an "expert in th[e] area" of criminal enterprises and was not offered as an expert in that area. *See* D.E. 1221 at 1224–26.[23]

All three grounds were mistaken on either the facts, the law, or both. We explain why below.

### 1. RELEVANCE

Starting with relevance, the district court seems to have simply overlooked or misunderstood the government's Bloods-

---

[23] The district court did not exclude Dr. de la Cruz under the qualification or reliability aspects of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), or its progeny.

related evidence.  As detailed above, the government presented considerable testimony from a number of witnesses—including Sgt. Kelly, Agent Perez, and former DSBF members—about the DSBF being a Bloods gang or a Bloods-affiliated gang and the defendants using Bloods nicknames, terms, and signs. If the government thought that Bloods-related evidence was irrelevant, it would not have presented this evidence for the jury to consider.

Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401.  We have explained that "[t]he standard for what constitutes relevant evidence is a low one," *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002) (quoting Fed. R. Evid. 401), and given the government's Bloods-related evidence Dr. de la Cruz's testimony certainly met that bar.  *Accord* Roger C. Park & Aviva Orenstein, Trial Objections Handbook 2d § 2:1 (2023) ("Rule 401 adopts a very broad concept of relevance.").

"In the law, what's sauce for the goose is normally sauce for the gander," and we "have applied this commonsense principle of equal treatment in the context of expert witnesses." *United States v. Knowles*, 889 F.3d 1251, 1257–58 (11th Cir. 2018).  It is therefore "an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue." *United States v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1993).

This principle, we think, also applies when the defense wants to present expert testimony to counter factual testimony and/or lay opinions offered by government witnesses. Where the government presents evidence to support a certain theory, a defendant is entitled to rebut that theory with evidence of his own. *See, e.g., United States v. Word*, 129 F.3d 1209, 1212–13 (11th Cir. 1997) (reversing conviction because the defendant "was not afforded the opportunity to present evidence to counter the government's argument," as the government's "trial strategy made this defense evidence highly significant"). Moreover, expert testimony can be used to counter an opponent's fact or lay opinion testimony. *See, e.g., Panger v. Duluth, Winnipeg & Pac. Ry. Co.,* 490 F.2d 1112, 1117 (8th Cir. 1974) (explaining that, where the plaintiff offered a lay opinion in his own testimony, "the defendant should have been accorded the right to counter that evidence with either factual evidence of its own or properly proffered expert testimony").

The defendants were charged in Count 1 with participating in a RICO conspiracy in which their criminal gang (the DSBF) was the alleged enterprise. Dr. de la Cruz's testimony about gangs (and the Bloods) would have been helpful to the jury in determining (a) whether the defendants were part of a criminal gang and (b) whether the gang constituted the enterprise alleged in the charged RICO conspiracy.

"Rule 702 . . . requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue[,]' [and] [t]his condition goes primarily to relevance."

*Daubert*, 509 U.S. at 591. The topics of gangs, gang membership, and gang affiliation are not matters within the "common knowledge of [lay] jurors." *Evans v. Mathis Funeral Homes, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993). Other circuits have allowed the sort of expert opinions that Dr. de la Cruz sought to offer, and we think their decisions are persuasive on this point. *See, e.g., United States v. Portillo*, 969 F.3d 144, 169 (5th Cir. 2020) (upholding district court's decision to allow a government expert to testify about the Bandidos Outlaw gang, which was the charged enterprise in a RICO case: "Likewise, the district court did not abuse its discretion in concluding that Schuster's testimony [about the Bandidos Outlaws] would be helpful to the jury."); *United States v. Kamahele*, 748 F.3d 984, 999 (10th Cir. 2014) ("The district court allowed Officer Merino's testimony after finding that it helped the jury by providing insights into the distinctive traits of TCG [the alleged gang], a topic beyond the knowledge of most jurors. This ruling fell within the district court's discretion[.]"). Moreover, that Dr. de la Cruz's testimony focused in part on the national Bloods gang did not render his opinions about the defendants or the DSBF irrelevant or otherwise improper. *See United States v. Ledbetter*, 929 F.3d 338, 349 (6th Cir. 2019) ("Detective Caffey would not have been a reliable expert on the Short North Posse itself. But he did not purport to be. Detective Caffey opined about the national Crips gang, on which he was qualified, and the Government used other testimony to show that the Short North Posse fit the description of a Crip set. This exact approach—eliciting expert testimony on a national gang and

separately drawing a link to the local set—was approved of [by us in an earlier case].").

Dr. de la Cruz's testimony also did not improperly go to an ultimate issue in the case. As we explained earlier, with the exception of testimony on the mental state or condition of a defendant in a criminal case, there is no categorical prohibition on expert testimony concerning an ultimate issue of fact: except as provided in subsection (b) of Rule 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). As a result, "the mere fact that an expert's conclusion trenches upon a jury issue does not compel exclusion" because Rule 704 "abolishes the per se rule against testimony regarding ultimate issues of fact." *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) (holding that, in a criminal prosecution for conducting an illegal gambling business, a government expert's testimony that certain transactions constituted "lay off bets" was admissible).

In the government's view, Dr. de la Cruz's testimony was "akin to Pat Riley [the former head coach for the Lakers, Knicks, and Heat] asserting that a group from a YMCA recreational league did not constitute a 'basketball team' because, in his decades of NBA experience, a team required players drafted from top college programs, paid millions of dollars, and . . . practiced multiple days a week." Appellee's Br. at 56. But that hypothetical does not quite fit.

The proper question is not, as the government suggests, whether Mr. Riley would have been allowed to testify that a YMCA

team playing a pickup game is a not team in the sense of the rules of basketball, but whether he would have been allowed to testify that such a team—which can change players every day or week and may not have any collective continuity or goal over a period of time—is not an enterprise with relationships among its members (the changing players) and a longevity sufficient to pursue a given common purpose. One of the instructions provided to the jury explained that a RICO enterprise, "in addition to having a common purpose, must have personnel who function as a continuing unit," and that "an association of individuals may retain its status as an enterprise even though the membership of the association changes by adding or losing individuals during the course of its existence." D.E. 725 at 19.

## 2. THE EXISTENCE OF AN ENTERPRISE

In addition, Dr. de la Cruz's testimony did not amount to an improper legal conclusion. One of the factual issues the jury was asked to decide was whether the defendants agreed (i.e., conspired) to participate in a racketeering enterprise. *See* D.E. 725 at 17–18. To that end, the district court gave the jury a definition of a RICO enterprise. *See id.* at 19.

As a number of our sister circuits have explained, the "existence *vel non* of a RICO enterprise is a question of fact for the jury." *United States v. Console*, 13 F.3d 641, 650 (3d Cir. 1993). *Accord United States v. Sanders*, 928 F.2d 940, 943 (10th Cir. 1991) (explaining that, in a RICO prosecution, "[t]he issues of ongoing organization, continuing membership and an enterprise existing apart from the

underlying pattern of racketeering are factual questions for the jury"); *United States v. DeFries*, 129 F.3d 1293, 1310 n.9 (D.C. Cir. 1997) ("To the extent that the government argues that whether the two unions constituted a single enterprise is a matter of law, it is mistaken."). Dr. de la Cruz's opinion that the defendants and their gang—the DSBF—were not a criminal enterprise therefore did not constitute an impermissible opinion on a legal issue. *See also United States v. Weinstein*, 762 F.2d 1522, 1535–39 (11th Cir. 1985) (analyzing the existence of a RICO enterprise as a fact question for the jury).

Indeed, because the existence of an enterprise is an element of a substantive RICO offense under 18 U.S.C. § 1962(c), *see United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir. Unit B 1981), it is the jury which must decide whether an enterprise has been proven beyond a reasonable doubt. *See United States v. Turkette*, 452 U.S. 576, 583 (1981) ("In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' . . . The existence of an enterprise remains a separate element which must be proved by the Government."); 11th Cir. Crim. Pattern Jury Instructions, Offense Instruction 75.1 for 18 U.S.C. § 1962(c) (to convict a defendant of a § 1962(c) offense the jury must find beyond a reasonable doubt that, among other things, the defendant "was associated with an enterprise" and that the "enterprise was involved in or affected interstate commerce"); 2B Kevin F. O'Malley et al., Federal Jury Practice & Instructions § 56:03 (6th ed. & Feb. 2024 update) (instruction for 18 U.S.C. § 1962(c): "In order to sustain its burden of proof for the crime of participating in the affairs of an interstate

enterprise through a pattern of racketeering activity as charged in Count __ of the indictment, the Government must prove the following five (5) essential elements beyond a reasonable doubt. One: An enterprise, as described in the indictment, existed on or about the time alleged in the indictment . . . .”). Dr. de la Cruz's testimony was relevant.

In his partial dissent, Judge Brasher suggests that Dr. de la Cruz's testimony regarding the typical characteristics of criminal enterprises impermissibly went to a question of law—the definition of the statutory term enterprise under RICO. We disagree. Just because an element of an offense has a legal definition (or prescribed legal parameters) does not mean that it is transformed into a question of law. For example, the terms actual and constructive possession have legal definitions, but in a narcotics prosecution under 21 U.S.C. § 841(a)(1) the jury must decide, as a factual matter, whether the defendant possessed a controlled substance. *See, e.g., United States v. Woodward*, 531 F.3d 1352, 1360–61 (11th Cir. 2008). Similarly, the term scheme to defraud has a legal definition, but in a prosecution for mail fraud under 18 U.S.C. § 1341 it is the jury which must determine, as a factual matter, whether the defendant engaged in a scheme to defraud. *See, e.g., United States v. Giarratano*, 622 F.2d 153, 155–56 (5th Cir. 1980). Indeed, as described above, courts around the country allow testimony regarding gangs in RICO cases. *See, e.g., Portillo*, 969 F.3d at 169; *Kamahele*, 748 F.3d at 999; *Ledbetter*, 929 F.3d at 349.

Dr. de la Cruz was therefore entitled to testify regarding what he believed to be the typical characteristics of a gang or criminal enterprise. And even if the district court could have permissibly excluded some of Dr. de la Cruz's opinions, wholesale exclusion of the testimony regarding gang characteristics was an abuse of discretion, especially given the government's extensive testimony on this very issue.

### 3. 18 U.S.C. § 1962(d) AND ENTERPRISE EVIDENCE

We pause for a moment here to note that several circuits have held that the existence of an enterprise is not an element of a § 1962(d) conspiracy. *See, e.g., United States v. Rich*, 14 F.4th 489, 492–94 (6th Cir. 2021) (citing similar cases from the Second, Ninth, and Tenth Circuits). But others have come to a different conclusion. *See, e.g., United States v. Olson*, 450 F.3d 655, 663–64 (7th Cir. 2006).

Some of our decisions suggest the that the existence of an enterprise is not an element of a § 1962(d) offense. *See, e.g., United States v. Starret*, 55 F.3d 1525, 1543 (11th Cir. 1995) ("To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that the defendants 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.'") (citation omitted). But one of our early cases points in a different direction. In *Phillips*, 664 F.2d at 1011, the panel explained that a substantive RICO violation under § 1962(c) has "the following elements: (1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the

defendant 'associated with' the enterprise; (3) that the defendants participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity, i.e., by committing at least two of the racketeering activity designated in 18 U.S.C. § 1961(1)." Then the panel stated that "[p]roof of a RICO conspiracy charge requires that the government prove the *additional* element of an agreement." *Id.* at 1012 (emphasis added). By using the word "additional," the panel in *Phillips* suggested that the existence of an enterprise—an element of a substantive RICO violation—is also an element of a RICO conspiracy.[24]

Our reading of *Phillips* is supported by other Eleventh Circuit cases. In *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991), we said that, "[i]n addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuing racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *See also United States v. Weismann*, 899 F.2d 1111, 1115–16 (11th Cir. 1990) (reversing RICO conspiracy conviction under § 1962(d) because the district court improperly changed the enterprise charged in the indictment); *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990) ("The issues are as follows: (1) whether the government presented

[24] As a Unit B decision of the Former Fifth Circuit, *Phillips* constitutes binding precedent under *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

sufficient evidence (a) to establish the existence of an enterprise for the purposes of a RICO conspiracy . . . .").

We need not definitively decide today whether the existence of an enterprise is an element of a RICO conspiracy under § 1962(d). First, the government does not raise the issue. Second, the district court instructed the jury that one of the elements for the Count 1 RICO conspiracy charge was that "the enterprise was engaged in, or that its activities affected, interstate or foreign commerce." D.E. 725 at 17–18. As this case was tried, therefore, whether the DSBF constituted an enterprise was a critical issue for the charged RICO conspiracy. *Cf. Cole v. Arkansas*, 333 U.S. 196, 202 (1948) ("To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court.").

### 4. THE DEFENDANTS' PROPOSED USE OF DR. DE LA CRUZ

Again, even if it may not have been error for the district court to exclude some of Dr. de la Cruz's opinions, it was error to exclude his testimony as to the Bloods gang and the non-existence of a criminal enterprise. *See United States v. Cohen*, 510 F.3d 1114, 1126 (9th Cir. 2007) ("[T]he best way for the district court to have insured the exclusion of the potentially inadmissible aspects of [the expert's] testimony was not to bar him from testifying altogether, but to sustain the government's objections to particular questions likely to elicit inadmissible evidence under the rule."). The defendants made it known at all times that they intended to use Dr. de la

Cruz's testimony to rebut the criminal enterprise element of the RICO conspiracy charge. Before trial, for example, Mr. Hayes explained in response to the government's motion to exclude Dr. de la Cruz that his testimony would "help resolve the [g]overnment's main theory as to how the [c]odefendants allegedly maintained a RICO 'enterprise.'" D.E. 679 at 4. Mr. Hayes acknowledged that disproving the defendants' association with the national Bloods gang would not "automatically disprove whether the [c]odefendants operated a RICO 'enterprise[,]'" but maintained it would "disprove the [g]overnment's theory as to what kind of RICO 'enterprise'" they formed. *See id.* at 3 n.1. The defendants' legal position was well founded. *See United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016) (explaining, in a RICO case involving the Latin Kings gang, that "[g]ang-affiliation evidence may be highly probative of an individual's membership in a particular gang, so it 'has been held admissible, in cases where the interrelationship between people is a central issue'") (citation omitted). During trial, the defendants again argued that "one of the critical issues in this case is whether or not this is . . . [a] criminal enterprise, which is what Dr. de la Cruz is going to testify about." D.E. 1221 at 65–66. Finally—and most importantly—Dr. de la Cruz's proffered testimony delivered as promised. *See, e.g., id.* at 108 ("This particular group does not meet one of the elements of a criminal enterprise, in my opinion.").

The government defends the district court's wholesale exclusion of Dr. de la Cruz on one additional ground—it maintains

that his testimony contravened Supreme Court precedent on what a RICO enterprise entails.  That contention, we think, is mistaken.

The Supreme Court has held that an enterprise must have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." *Boyle*, 556 U.S. at 940–41.  "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

As summarized earlier, Dr. de la Cruz opined in part that the defendants were not a gang because (1) they were a "bunch of yahoos running around . . . breaking the law with no sense of direction, with no leadership direction," (2) they used drugs, which was inconsistent with the behavior of those in criminal enterprises, (3) they did not get together for meetings to discuss the organization's business, (4) they were "shooting each other indiscriminately," and (5) they did not kill rivals.  This aspect of his testimony would have gone to the existence and purpose of the alleged enterprise and the relationships among those associated with it, two of the structural features identified by the Supreme Court in *Boyle*. *See United States v. Daly*, 842 F.2d 1380, 1388–89 (2d Cir. 1988) (explaining that, had an objection been made to a qualified expert's testimony on "the existence of a RICO enterprise"—based on an "understanding of the existence of organized crime and the Gambino family"—it would not "have been sustain[ed] under Rules 702, 703, and 704").

The government may think that Dr. de la Cruz's testimony was not credible or persuasive, but ultimate acceptance by the jury is not the standard for admissibility under Rule 702.

## D. Prejudice

We now turn to whether the wholesale exclusion of Dr. de la Cruz's expert testimony was prejudicial. In cases of non-constitutional error where, as here, a party has preserved an objection, the government bears the burden of demonstrating that the error is harmless. *See United States v. Davila*, 569 U.S. 597, 607 (2013); *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020). A "non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, 'or had but very slight effect[.]' If one can say 'with fair assurance . . . that the judgment was not substantially swayed by the error,' the judgment is due to be affirmed even though there was error." *United States v. Hornaday*, 392 F.3d 1306, 1315–16 (11th Cir. 2004) (citations omitted).

The government has failed to argue that the exclusion of Dr. de la Cruz was harmless error. Because its brief does not address harmlessness, the government has failed to carry its burden. *See Davila*, 569 U.S. at 607. But under our precedent that is not necessarily the end of the matter.

We have the discretion to *sua sponte* determine whether an error is harmless. *See Horsley v. State of Alabama*, 45 F.3d 1486, 1492 n.10 (11th Cir. 1995) (citing *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991)). "But that discretion is not an obligation."

*Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1298 (11th Cir. 2022).  We have chosen to exercise that discretion where, for example, the harmlessness was "patently obvious."  *United States v. Adams*, 1 F.3d 1566, 1576 (11th Cir. 1993).  And we have recently held that issues not raised by a party can be considered *sua sponte* by the court only in "extraordinary circumstances."  *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc).

The Seventh Circuit considers three factors, as set out in *Giovannetti*, when deciding whether to exercise its *sua sponte* discretion: (1) "the length and complexity of the record"; (2) "whether the harmlessness of the error or errors found is certain or debatable"; and (3) "whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court."  *Giovannetti*, 928 F.2d at 227.  The *Giovannetti* factors are relied on by other circuits.  *See, e.g., United States v. Pryce*, 938 F.2d 1343, 1348 (D.C. Cir. 1991).  We too find the *Giovannetti* factors helpful, but do not confine ourselves to them.  *See Campbell*, 26 F.4th at 873.

Nothing about this case—and this issue in particular—is amenable to a *sua sponte* review for harmlessness.

First, the record is long and complex.  This is an appeal by 10 defendants from a 38-day trial on a 23-count indictment.  The trial transcript is nearly 8,000 pages long, and the exhibit pages number in the thousands.  To determine the effect of the exclusion of Dr. de la Cruz on the six defendants convicted of the RICO conspiracy charge, we would have to sift through the voluminous record to contrast the strength of the government's case with that of

the defendants had Dr. de la Cruz's testimony been allowed—a task not generally befitting of an appellate court. *See Pryce*, 938 F.2d at 1348 ("[An appellate] court should normally conduct the harmless error inquiry on its own initiative only where the relevant portions of the record are reasonably short and straightforward."). We have declined to scour the record to plug gaps in the defendants' briefing, *see* Part IV.F, and do the same here.

Second, the harmlessness of the error is far from certain. In fact, we have serious doubts that the wholesale exclusion of Dr. de la Cruz was harmless. Time and again, courts (including ours) have held that when a defendant's expert was wrongfully excluded, and that expert sought to rebut the government's own expert on a central issue (e.g., an element of the offense), the error was prejudicial. *See, e.g., Lankford*, 955 F.2d at 1552–53 ("Although [Mr.] Lankford did state that he believed the $1500 check did not need to be reported [to the IRS], the district court did not allow him to present evidence to the jury to explain why that belief would have been reasonable. The government, however, was allowed to pose a hypothetical question to a tax preparer concerning whether the proper course of conduct should have been to report the $1500 as income. Given the possible construction of the facts by the jury and given the defense's inability to present expert testimony to rebut the expert opinion elicited by the government, we simply cannot conclude that the trial court's error was harmless."); *United States v. Diallo*, 40 F.3d 32, 35 (2d Cir. 1994) ("It is noteworthy that the government was permitted to call its own expert (a DEA agent) to establish an economic motive for [Mr.] Diallo to smuggle

heroin.   [Mr.] Diallo's expert (a commodities analyst), in turn, would have shown an economic motive to smuggle gold.  Having allowed the government to call as an expert a DEA agent, who was surely no more qualified as an expert in heroin than [Mr. Diallo's expert] was in gold, the district court should have accorded the defendant the same right.  Turnabout is fair play, even in the federal courts."); *Cohen*, 510 F.3d at 1127 (holding that it was prejudicial error to exclude the defendant's expert, who was to explain that the defendant's mental disorder may have affected "his ability to form the requisite *mens rea*").

Here the district court prohibited Dr. de la Cruz from testifying that the DSBF was not a criminal gang and that, as a result, there was no RICO enterprise.  His testimony would have helped the defendants counter the testimony—including the lay opinions—presented by government witnesses like Agent Mayo, Sgt. Kelly, Agent Perez, Mr. Grimes, and Mr. Coakley.  *See Word*, 129 F.3d at 1212–13.

Third, we understand that reversal on this issue might lead to costly and lengthy proceedings if the government chooses to retry the six defendants on Count 1. But we cannot say with certainty that the result of a new trial would be a foregone conclusion.  A jury, for example, may find some of Dr. de la Cruz's opinions sufficiently persuasive to create reasonable doubt.

We do not vacate convictions in cases like this one lightly. And we appreciate the immense undertaking required of all parties to bring this case to trial, and acknowledge that it would be equally

or even more burdensome to do it again years later. But paramount to our sensitivity for the government's limited resources and the district court's docket is our duty to ensure that the defendants receive a fair trial. *See Taylor v. Illinois*, 484 U.S. 400, 408 (1988) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself.") (citation omitted).

Accordingly, we vacate the Count 1 convictions of Mr. Graham, Mr. Glass, Jerimaine Bryant, Mr. Walker, Curtis Bryant, and Mr. Hayes, as well as their sentences. If the government decides not to retry them on Count 1, these defendants will need to be resentenced. *See United States v. Klopf*, 423 F.3d 1228, 1245 (11th Cir. 2005) (discussing the "sentencing package" doctrine and the need for resentencing when one of the components has been set aside).

## VI. THE JURY INSTRUCTIONS

We now turn to the challenges to the jury instructions by Messrs. Jones, Rodriguez, and Glass. None of them objected to the jury instructions below and none contest that their claims are subject to plain error review.[25]

---

[25] The defendants objected to the instruction for Count 1 but not on the ground they now raise on appeal. *See United States v. Sentovich*, 677 F.2d 834, 837 (11th Cir. 1982) ("A party not raising an argument below waives his right to raise it on appeal absent plain error."). Accordingly, their present challenge to the instruction for Count 1 was not properly preserved. *See United States v. Wheeler*, 540 F.3d 683, 689 (2d Cir. 2008) ("Because Wheeler did not explain to

"Jury instructions will not be reversed for plain error unless the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice, or the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pepe*, 747 F.2d 632, 675 (11th Cir. 1984) (citation and internal quotation marks omitted). If a defendant demonstrates plain error, we have the discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Rosales-Mireles*, 585 U.S. at 135.

## A. COUNT 1

Mr. Glass contests the district court's instruction on Count 1, the RICO conspiracy charge. He points out that the instruction required only that the jury agree on the type of racketeering activity that the defendants agreed to commit. As a result, it violated due process by permitting the jury to convict him without unanimously agreeing on which two specific acts of racketeering he committed.[26]

Mr. Glass relies primarily on *Richardson v. United States*, 526 U.S. 813, 818–20 (1999). In that case the Supreme Court held that, for a conviction for the offense of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, "a jury has to agree

_____

the district court the objection he raises on appeal, he has not preserved it. Thus, we review his claim for plain error.") (citations omitted).

[26] Although we have set aside the Count 1 convictions, we address this issue in case there is a retrial.

unanimously about which specific violations make up the 'continuing series of violations'" of the charge. *Id.* at 815. We have not yet decided in a published opinion whether to extend the holding in *Richardson* to the RICO context. *See United States v. Hein*, 395 F. App'x 652, 655–56 (11th Cir. 2010) (declining to address the issue). As far as we can tell, however, every circuit to confront the issue after *Richardson* "has concluded that for a RICO conspiracy charge the jury need only be unanimous as to the types of racketeering acts that the defendants agreed to commit." *United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015). *See also Rios*, 830 F.3d at 434 (concluding that a unanimity instruction was not required); *United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) (agreeing "that it is not necessary to prove the specific predicate acts that supported a RICO conspiracy charge in order to prove a defendant's participation in a RICO conspiracy"); *United States v. Applins*, 637 F.3d 59, 80–82 (2d Cir. 2011) (same). *Cf. United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991) (same but pre-*Richardson*).

Assuming without deciding that the district court erred, we hold that Mr. Glass cannot show that the alleged error was "plain" because there is no Eleventh Circuit precedent on point and because the weight of authority in other circuits is adverse to him. *See Hesser*, 800 F.3d at 1325 ("'Plain' error means that the legal rule is clearly established at the time the case is reviewed on direct appeal."). Accordingly, his challenge to the instruction for Count 1 fails.

## B. COUNT 2

Mr. Jones takes issue with the district court's failure to instruct the jury on Count 2—the narcotics conspiracy charge—that the government was required to prove his guilt with post-juvenile conspiracy activity or, alternatively, that he had to ratify his participation in the conspiracy after he turned 18.

Mr. Jones' argument is foreclosed by our precedent. In *United States v. Cruz*, 805 F.2d 1464, 1475–76 (11th Cir. 1986), we held that the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. § 5031 et seq., does not require a limiting instruction concerning juvenile conduct where a defendant's participation in the charged conspiracy continues past his 18th birthday. *See also United States v. Newton*, 44 F.3d 913, 919 & n.8 (11th Cir. 1994) (stating that the district court's charge to the jury "that they could find [the defendant] guilty only for acts that he committed after his eighteenth birthday" appeared to be a "benefit . . . to which he was not entitled"). *Accord United States v. Camez*, 839 F.3d 871, 876 (9th Cir. 2016) (favorably citing *Cruz* for the proposition that the FJDA does not require a special jury instruction); *United States v. Doerr*, 886 F.2d 944, 969 (7th Cir. 1989) (same).

There was no error, plain or otherwise. As we explain later, Mr. Jones ratified his participation in the narcotics conspiracy after his 18th birthday by selling marijuana for Mr. Glass. *See, e.g.,* D.E. 1208 at 207. No jury instruction on juvenile conduct was required.

### C. COUNT 10

Mr. Rodriguez claims that the district court committed plain error when it instructed the jury on the offense of possession of a

firearm in furtherance of a drug-trafficking crime (Count 10) and aiding and abetting possession of a firearm in furtherance of that crime. In his view, the juxtaposition of those instructions confused the jury and caused it to speculate as to what species of knowledge was required to convict him because of the respective crimes' different knowledge elements; the substantive possession instruction required "knowledge of the firearm's presence," while the aiding and abetting instruction required "advance knowledge that another participant would possess a firearm." *See* D.E. 725 at 40–41. There was no plain error.

Count 10 charged Mr. Rodriguez (and Mr. Ingram) with a substantive violation of 18 U.S.C. § 924(c) on May 6, 2016, and included a citation to 18 U.S.C. § 2, the aiding and abetting statute. *See* D.E. 193 at 15–16. Mr. Rodriguez concedes that both instructions—the § 924(c) instruction and the aiding and abetting instruction—were independently "correct[ ]." *See* M. Rodriguez Br. at 47. And he is right. *See, e.g., Rosemond*, 572 U.S. at 78 (holding that aiding and abetting liability under § 924(c) requires "advance knowledge"). We do not see how the district court could have plainly erred by providing separate and independently correct instructions for the two distinct forms of liability charged in Count 10.

We note, as well, that Mr. Rodriguez's jury confusion argument is not persuasive. Count 23, like Count 10, charged Mr. Rodriguez (and Mr. Ingram) with a separate § 924(c) violation on May 9, 2017, and it too included a citation to § 2. *See* D.E. 193 at 25.

Though the jury instructions for Count 23 were the same as for Count 10, the jury acquitted Mr. Rodriguez and Mr. Ingram on Count 23.

## VII. SUFFICIENCY OF THE EVIDENCE

Multiple defendants challenge the sufficiency of the evidence on some of their convictions. "We review *de novo* the sufficiency of evidence." *United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018) (citation omitted). The relevant question is whether, viewing the evidence in the light most favorable to the government, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Significantly, the evidence "need not exclude every reasonable hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt." *United States v. Kincherlow*, 88 F.4th 897, 904 (11th Cir. 2023).

### A. COUNT 1

Mr. Graham, Mr. Walker, and Jerimaine Bryant challenge the sufficiency of the evidence on Count 1, which charged them with a RICO conspiracy in violation of 18 U.S.C. §1962(d). The indictment alleged an illegal enterprise (the DSBF) implemented through criminal activities like "drug trafficking, provision of firearms to prohibited persons, illegal gambling, fraud, money laundering, robbery, assault, and murder." D.E. 193 at 5.[27]

---

[27] We address the Count 1 sufficiency issues because, if the defendants are correct, double jeopardy will bar their retrial on the RICO conspiracy charge. *See*

## 1. BACKGROUND

"A RICO conspiracy differs from an ordinary conspiracy in two respects: it need not embrace an overt act, and it is broader and may encompass a greater variety of conduct." *Pepe*, 747 F.2d at 659 (footnotes omitted). The "touchstone of liability" under § 1962(d) is an agreement to participate in a RICO conspiracy. *See Browne*, 505 F.3d at 1264. The government may prove such an agreement by showing either (1) "an agreement on an overall objective of the conspiracy," or (2) "that a defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a 'single objective.'" *Id.* "If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts." *United States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001).

The government may establish an overall objective "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991) (citation and internal quotation marks omitted). And under either theory described above, "the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime described in the indictment,

---

*United States v. Blizzard*, 674 F.2d 1382, 1386 (11th Cir. 1982) ("'The double jeopardy clause does preclude a second trial once a reviewing court has determined that the evidence introduced at trial was insufficient to sustain the verdict.'").

or knew his fellow conspirators, or was aware of all the details of the conspiracy." *Pepe*, 747 F.2d at 659. "That each conspirator may have contemplated participating in different and unrelated crimes is irrelevant." *Id.* at 659–60.

### 2. THE EVIDENCE

There was sufficient evidence from which the jury could find that Mr. Graham. Mr. Walker, and Jerimaine Bryant agreed to participate in a criminal enterprise, the DSBF, through a pattern of racketeering activity. *See Starrett*, 55 F.3d at 1547.

The indictment alleged that the DSBF's overall objective "was to generate money for its members and associates." *See* D.E. 193 at 5. The defendants operated out of a defined territory, the South Gwen Cherry complex, and used violence to control their turf. Outsiders were not tolerated. Mr. Johnson was just one example of an unfortunate outsider who, after a perceived attempt to encroach on DSBF turf, was murdered (by Mr. Glass). The group also had a loose hierarchical structure, with Ike Johnson as its founder in the early 2000s and Mr. Glass succeeding him around 2012. Members of the DSBF sold drugs or acted as lookouts or gunmen, while others supplied the organization with drugs and firearms. And some of the same members who worked the streets together regularly engaged in robberies to further enrich themselves; they stole cars and robbed random victims or rival dealers. For the organization, making money was the primary objective.

Jerimaine Bryant challenges the existence of a criminal enterprise. Again, we need not decide whether the existence of an

enterprise is an element of a § 1962(d) conspiracy.  *See* Part V.C.
The evidence summarized above allowed the jury to find a RICO
enterprise.  An "enterprise" includes an association-in-fact, defined
as having "a purpose, relationships among those associated with
the enterprise, and longevity sufficient to permit these associations
to pursue the enterprise's purpose."  *Boyle*, 556 U.S. at 946.  Our
sister circuits have held that a criminal gang like the DSBF, whose
purpose is to make money by selling drugs, perpetrating robberies,
and/or committing murders, can and does constitute a RICO en-
terprise.  *See generally* 18 U.S.C. § 1961(1) (racketeering activity in-
cludes murder, robbery, and controlled substance offenses prohib-
ited by state law and punishable by imprisonment for more than
one year).  We find their decisions persuasive and follow them.  *See,
e.g., Harris*, 695 F.3d at 1136; *United States v. Cornell*, 780 F.3d 616,
621–23 (4th Cir. 2015); *United States v. Brown*, 973 F.3d 667, 682–83
(7th Cir. 2020); *United States v. Applins*, 637 F.3d 59, 77–78 (2d Cir.
2011); *United States v. Jones*, 873 F.3d 482, 489–91 (5th Cir. 2017);
*United States v. Rodríguez-Torres*, 939 F.3d 16, 24–27 (1st Cir. 2019).

Jermaine Bryant's only remaining sufficiency argument is
that he had withdrawn from the DSBF following his release from
prison in 2011.  His elevated role in the gang before then is uncon-
tested.

Viewing the evidence in the light most favorable to the gov-
ernment, the jury could find that Jermaine Bryant continued to
operate in concert with the overall objective of the RICO conspir-
acy after his release from prison.  For one, he was a prominent

supplier for Mr. Glass.  *See United States v. Russo*, 796 F.2d 1443, 1460–61 (11th Cir. 1986) (evidence that the defendant was a "main supplier of drugs" to the organization was "more than sufficient to support his RICO conspiracy conviction").  He also continued to endorse the DSBF on social media.  In 2013, for instance, he identi-fied himself as a "Smackville top smacker," which meant a senior member of the DSBF.  In 2014, he mourned the death of a fallen DSBF member.  And in 2015, he posted a "shout out" to "[his] Blood, [his] gang . . . ya know what we Bleed #GMT."  Addition-ally, the jury returned guilty verdicts against him on three post-2011 narcotics charges—possession of controlled substances with intent to distribute (Counts 5, 12, and 21)—that could serve as pred-icate acts.  The government's evidence therefore was sufficient to support Jerimaine Bryant's conviction for the RICO conspiracy. *See Browne*, 505 F.3d at 1264.

As for Messrs. Graham and Walker, they were on the front lines generating money for the DSBF.  Both were "servers" who sold crack cocaine and marijuana for Mr. Glass.  Ms. Houser, Mr. Coakley, and Donzell Jones all testified to that effect.  According to Mr. Coakley, Messrs. Graham and Walker also acted as lookouts, and Mr. Graham participated with him in robberies.  Messrs. Gra-ham and Walker even exchanged text messages about narcotics transactions.

In response to this evidence, Messrs. Graham and Walker posit that they were merely independent drug dealers with a fleet-ing association with the DSBF.  *See United States v. Achey*, 943 F.3d

909, 917 (11th Cir. 2019) ("[A] simple buyer-seller controlled substance transaction does not, by itself, form a conspiracy."); *United States v. Mercer*, 165 F.3d 1331, 1333–35 (11th Cir. 1999) (an agreement to the mere "exchange of drugs for money" is "not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction"). Mr. Graham, for example, refers to a series of social media posts where he repeated certain statements ("I don't work for nobody. I do my own shit.") as evidence of his independence from the organization. But the jury heard contrary testimony, as described above, and was free to disregard Mr. Graham's statements of independence. *See id.* at 1335 ("[W]e have held that an agreement may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser.").

Messrs. Graham and Walker also point to a text message between them from 2016 as evincing their unease with continuing to sell drugs for Mr. Glass. *See* D.E. 1217 at 20 ("I'm about to just tell em bra. I'm even feel like dealing with this crack no more."). Far from helping their cause, however, this message is an admission that they were in fact "servers" for the DSBF and does nothing to erase their prior conduct. *See Achey*, 943 F.3d at 917 ("[A] conspiracy can be found if the evidence allows an inference that the buyer and seller knew the drugs were for distribution instead of merely understanding their transactions to do no more than support the buyer's personal drug habit.") (citation and internal quotation marks omitted). Nor do they point to any evidence that, like Donzell Jones, they were allowed to sell drugs with the DSBF in

the South Gwen Cherry complex based on a longtime friendship with Mr. Glass, rather than as members of the organization.  Accordingly, the government presented sufficient evidence to establish that Messrs. Graham and Walker agreed to advance the conspiracy's overall objective of generating money for the DSBF and its members.

## B.  Count 2

Jerimaine Bryant, along with Messrs. Rodriguez, Ingram, and Jones, challenge the sufficiency of the evidence to support their convictions on Count 2, which charged them with conspiracy to possess 280 grams or more of crack cocaine and marijuana with the intent to distribute, in violation of 21 U.S.C. § 846.  We find the evidence sufficient for all four defendants.

### 1.  Single Conspiracy

To establish a narcotics conspiracy under § 846, the government must prove that (1) there was a conspiracy or agreement to possess a controlled substance with the intent to distribute it, (2) the defendants knew the essential unlawful objects of the conspiracy, and (3) the defendants knowingly and voluntarily joined the conspiracy.  *See United States v. Duldulao*, 87 F.4th 1239, 1253–54 (11th Cir. 2023); *Dixon*, 901 F.3d at 1335.  Proof of an overt act is not required.  *See Shabani*, 513 U.S. at 11.

When the government seeks to prove a single overarching conspiracy, it may rely on evidence such as "whether a common goal existed [among the conspirators]," "the nature of the underlying scheme," and "the overlap of participants."  *Dixon*, 901 F.3d at

1335 (citation omitted).  Importantly, "separate transactions are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal.  If a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established."  *Id.* (citation omitted).  *See also United States v. Russo*, 717 F.2d 545, 549 (11th Cir. 1983) (stating that circumstantial evidence may suffice to prove participation in a conspiracy).  Whether a single conspiracy existed is generally a question of fact for the jury. *See United States v. Alred*, 144 F.3d 1405, 1414 (11th Cir. 1998).

The government presented sufficient evidence for the jury to find beyond a reasonable doubt that these four defendants were part of a single narcotics conspiracy with common goals.  Those common goals were simple: buying and selling crack cocaine and marijuana for profit in the South Gwen Cherry complex.  *See United States v. Richardson*, 532 F.3d 1279, 1285 (11th Cir. 2008) (explaining that "[c]ourts typically define the common goal element as broadly as possible," including, for example, "a common goal of buying and selling cocaine for profit" in a set area, and compiling cases to that effect) (citation omitted).  In furtherance of that goal, the defendants operated a "marketplace" of crack cocaine and marijuana, complete with sellers, lookouts, and enforcers.  *See United States v. Brown*, 587 F.3d 1082, 1090 (11th Cir. 2009) (describing a "farmer's market" and "marketplace" at the heart of the drug conspiracy); *United States v. Westry*, 524 F.3d 1198, 1212–13 (11th Cir. 2008) (explaining that the defendants were "engag[ed] in a consistent series of smaller transactions that furthered [the conspiracy's] ultimate

object of supplying the consumer demand of the market," and the conspiracy consisted of "various acts of distribution at these several locations performed by numerous interrelated individuals"). And the scheme was replete with common players, as observed by law enforcement and video surveillance and supported by the defendants' social media posts and text messages. *See United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997) (noting the conspiracy's "extensive overlap of the participants").

## 2. COMMON GOAL

Jerimaine Bryant disputes his pursuit of a common goal following his 2008 arrest and 2011 release from prison, based largely on the same argument discussed above—that he had moved out of South Gwen Cherry to a nearby trailer park where he purported to sell drugs independently. We reject his argument.

By all accounts, Jerimaine Bryant continued to frequent the DSBF's area and mingle with his co-defendants. And he supplanted Ms. Houser as Mr. Glass' primary drug supplier. *See* D.E. 1207 at 22–23, 185; D.E. 1213 at 16, 50–51. This critical role in the DSBF's supply chain cemented his inclusion in the conspiracy after his 2011 release from prison.

## 3. MR. GRIMES' CREDIBILITY

The same four defendants also assail the credibility of a cooperating witness, Mr. Grimes, characterizing his testimony as incredible, untrustworthy, and uncorroborated. As a general matter, "[w]e will not disturb the jury's verdict [with respect to credibility] unless the testimony is incredible as a matter of law." *United States*

*v. Green*, 818 F.3d 1258, 1274 (11th Cir. 2016) (citation and internal quotation marks omitted).  That means that even "the uncorroborated testimony of an accomplice is sufficient to support a conviction in the federal courts if it is not on its face incredible or otherwise unsubstantial." *United States v. Iacovetti*, 466 F.2d 1147, 1153 (5th Cir. 1972).  *See also Green*, 818 F.3d at 1274 (testimony is not "incredible as a matter of law unless it is unbelievable on its face, that is, testimony as to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature") (internal quotations and citation omitted).  The defendants fail to satisfy this high bar as to Mr. Grimes.

Mr. Rodriguez is Mr. Grimes' most ardent challenger, and understandably so.  Without some of Mr. Grimes' testimony, the evidence plausibly supported a theory of defense that, for the most part, Mr. Rodriguez was an independent drug dealer who occasionally mingled with and dealt with DSBF members.  Mr. Rodriguez points out that he is older and that he sold his own drugs, out of his own home, away from the South Gwen Cherry complex.  By one account he occasionally sold drugs at South Gwen Cherry; by another he never did.  *Compare* D.E. 1205 at 25 (Mr. Grimes) *with* D.E. 1208 at 161 (Mr. Coakley).  The government's voluminous social media evidence contained some posts from Mr. Rodriguez declaring his allegiance to the DSBF or associating with other alleged members, but those posts were relatively few in number.  *See, e.g.,* Gov't Exh. 315 at 114–15.

Mr. Grimes, however, testified that Mr. Rodriguez oversaw DSBF initiations, used the DSBF handshake, and provided other members of the gang with guns. Mr. Coakley corroborated this in part, testifying that he saw Mr. Rodriguez "[s]ell drugs, supply guns, and supply dope." D.E. 1207 at 66–68. Although Mr. Grimes' testimony was not fully corroborated and the government's direct examination involved some leading questions, *see, e.g.,* D.E. 1205 at 25, those matters went to credibility and weight, which were for the jury to assess. And no one argues, for example, that Mr. Grimes could not have possibly seen what he testified to. *See Green*, 818 F.3d at 1274. The jury was therefore entitled to credit his testimony.

As for Mr. Ingram, Mr. Grimes identified him as a "bomb man" who retrieved the money from buyers, as well as a seller for the DSBF, and that testimony was echoed by Donzell Jones and Mr. Coakley. *See* D.E. 1202 at 75; D.E. 1205 at 20, 23, 25; D.E. 1206 at 166; D.E. 1208 at 209–10. The government also introduced text messages of others inquiring of Mr. Ingram about drugs, as well as his drug convictions from the relevant timeframe (which included one where he was the subject of an undercover drug buy). *See* D.E. 1202 at 111; D.E. 1211 at 121–23; D.E. 1212 at 208–09; D.E. 1215 at 71–72; D.E. 1221 at 23; D.E. 1223 at 138; D.E. 1224 at 63. With or without Mr. Grimes' testimony, sufficient evidence supported Mr. Ingram's conviction on Count 2.

### 4. THE FJDA

Mr. Jones raises a final, unique challenge to his conviction on Count 2. He claims that for a large portion of the alleged conspiracy he was a juvenile under the FJDA, 18 U.S.C. § 5301 et seq., such that his actions during that period of time were delinquencies rather than felonies. Absent that conduct, he argues, his post-juvenile conduct cannot alone sustain his Count 2 conviction.

Mr. Jones' argument fails. When, as is the case here, the government has proven that there was one continuous conspiracy and the defendant's membership in that conspiracy straddled his 18th birthday, his juvenile acts can be "the sole basis for guilt." *Newton*, 44 F.3d at 919 (citing *Cruz*, 805 F.2d at 1464). Mr. Jones participated in the alleged narcotics conspiracy after his 18th birthday by continuing to sell marijuana for Mr. Glass. *See* D.E. 1208 at 207. *See also* D.E. 1220 at 55 ("Let me get two bags from dodo"); D.E. 1221 at 18 ("Me either, but I rather FW the zone cause Dodo and Mullet got the loud dimes doe for $5. Weed gone live."). So the jury could properly consider his juvenile conduct. *See Cruz*, 805 F.2d at 1475–76. Mr. Jones' conviction for Count 2 stands.[28]

We affirm the convictions of Jerimaine Bryant and Messrs. Rodriguez, Ingram, and Jones on Count 2.

---

[28] Mr. Ingram, Mr. Graham, and Mr. Walker sought to adopt this particular argument by Mr. Jones. But whether a defendant's individual post-juvenile conduct can sustain a conviction for Count 2 is a fact-specific inquiry that requires independent briefing. *See, e.g., United States v. Khoury*, 901 F.2d 948, 963 n.13 (11th Cir. 1990). We therefore need not address the FDJA argument for these defendants.

## C. COUNT 10

Mr. Rodriguez challenges the sufficiency of evidence for his conviction on Count 10, possession of a firearm in furtherance of a drug trafficking crime. *See* 18 U.S.C. § 924(c). He attempts to rely on *Rosemond*, 572 U.S. at 77–78 (holding that, to aid and abet the offense of using a firearm during a drug trafficking offense, the defendant must know beforehand that one of his co-defendants will carry a gun), to argue that he lacked the requisite advance knowledge of Mr. Ingram's firearm possession. But that argument is a nonstarter. As the government correctly points out, Mr. Rodriguez was convicted of a substantive § 924(c) offense, and not of aiding and abetting someone else's § 924(c) offense.

In addition, Mr. Rodriguez challenges the evidence that he possessed a firearm at all. *See United States v. Woodard*, 531 F.3d 1352, 1362 (11th Cir. 2008) (stating that, to prove a § 924(c) offense, the government must establish the defendant knowingly possessed a firearm in furtherance of a drug trafficking crime). As to his own possession, however, there is no sufficiency problem. Mr. Rodriguez admitted that the firearm found at the residence belonged to him. *See* Gov. Exh. 110 at 41 ("[The gun is] just for protection, bro. I, if I need it, I, I use it, yeah, I use it."); D.E. 833-16 at 9, 29 ("[The gun] was mine."). Accordingly, Mr. Rodriguez's challenge to the § 924(c) conviction fails.

## D. COUNT 11

Mr. Graham and Curtis Bryant challenge their convictions on Count 11 for attempted possession of a controlled substance on

June 1, 2016, with the intent to distribute, in violation of 21 U.S.C. § 846.   The indictment alleged that, pursuant to 21 U.S.C. § 841(b)(1)(C), "this violation involved a mixture and substance containing a detectable amount of . . . 'crack cocaine.'" D.E. 193 at 16. The defendants argue that, because the evidence at trial showed only that the controlled buy constituting the charged conduct involved marijuana and not crack cocaine, they were entitled to a judgment of acquittal.

The government argues that the defendants' argument is flawed because a conviction for an inchoate offense under § 846 may rest on any controlled substance.   We agree.   In *United States v. Achey*, 943 F.3d 909, 913–14 (11th Cir. 2019), we explained the interplay between § 841 and § 846.   While § 841(a)(1) makes it a crime to intentionally distribute a controlled substance, § 846 makes it a crime to conspire or attempt to violate § 841(a)(1), and § 841(b)(1) merely provides the penalties for such inchoate violations. *See id.*

To establish a conspiracy offense under § 846, the government need only prove that a defendant agreed to possess and distribute what he knew was a controlled substance. *See id.* "The specific type of drug involved is not an element of [a conspiracy offense under] § 841(a) but is instead 'relevant only for sentencing purposes.'" *Id.* (citing *United States v. Rutherford*, 175 F.3d 899, 906 (11th Cir. 1999)).

We conclude that the same holds true for an attempt under § 846, which like conspiracy is an inchoate offense.   First,

impossibility is not a defense to an attempt offense under § 846. *See United States v. Everett*, 700 F.2d 900, 904 (3d Cir. 1983). Indeed, we have upheld a § 846 attempt conviction which was based on a transaction involving only sham cocaine. *See United States v. McDowell*, 705 F.2d 426, 427–28 (11th Cir. 1983). Second, for inchoate § 846 offenses like attempt and conspiracy, "the government need only prove that the defendant had knowledge that he was dealing with a controlled substance, not that he had knowledge of the specific controlled substance." *United States v. Woods*, 210 F.3d 70, 77 (1st Cir. 2000) (conspiracy and attempt).

Absent some sentencing issues that the defendants do not raise here, *see, e.g., Achey*, 943 F.3d at 914 n.5, the government did not have to prove *mens rea* as to a specific controlled substance at trial for the § 846 attempt charge. Consequently, there was sufficient evidence to convict Mr. Graham and Curtis Bryant on Count 11.

### E.  COUNT 22

Messrs. Rodriguez and Ingram attack their convictions on Count 22, which charged them with possession of a controlled substance with the intent to distribute on May 9, 2017, in violation of 21 U.S.C. § 841(a)(1). The evidence, however, was sufficient.

To establish a violation of § 841(a)(1), the government has to prove that the defendant "(1) knowingly (2) possessed [a controlled substance] (3) with intent to distribute it." *United States v. Harris*, 20 F.3d 445, 453 (11th Cir. 1994). Such possession may be actual or constructive, and constructive possession requires a

showing that "a defendant maintained dominion or control over the drugs or over the premises where the drugs are located." *Id.*

Mr. Rodriguez argues that, without the evidence illegally seized from the residence he shared with Mr. Ingram on May 9, 2017, the government had insufficient evidence to establish his constructive possession of the drugs found in the home's safe. But we have already concluded that this evidence was not subject to suppression. The government therefore properly introduced the evidence it found in his shared home, including a copy of his birth certificate, a scale, and a safe containing bulk and individually-packaged drugs (crack cocaine and marijuana) and cash. There was also his admission during his post-arrest interrogation that the drugs were his. This evidence soundly established his dominion over the place where the safe with the drugs was found, as well as his intent to distribute the drugs inside. Accordingly, there was sufficient evidence to support Mr. Rodriguez's conviction on Count 22.

The sufficiency challenge by Mr. Ingram fails for the same reasons. He attempted, and failed, to suppress the evidence seized from the shared residence. And that search also yielded a copy of Mr. Ingram's birth certificate and Social Security card. Although Mr. Ingram denies that the drugs found in the safe were his, officers found him in possession of narcotics, and there was evidence (in the form of testimony and text messages) linking him to the sale of drugs. *See, e.g.,* D.E. 1208 at 209–10 (Mr. Coakley: "I seen [Mr. Ingram] serve from Ike era to the time he got arrested. . . . [He] been serving for a long period of time . . . with [Mr. Rodriguez]."); D.E.

1205 at 162 (Mr. Grimes: "I don't remember the time and the date, but I seen [Mr. Ingram selling drugs]."); D.E. 1218 at 49 (Mr. Rodriguez to Mr. Ingram: "What's up with the loud for [Mr. Hayes]."). Consequently, a rational juror could have found Mr. Ingram guilty of possession of a controlled substance with the intent to distribute based on the drugs found in the shared residence.

## VIII. Cumulative Error

As a final matter relating to the convictions, Jerimaine Bryant, Curtis Bryant, and Messrs. Rodriguez, Graham, Walker, and Hayes contend that they are entitled to reversal of their convictions based on the doctrine of cumulative error. They are not.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (citation and internal quotation marks omitted), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813 (2006). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." *Id.* (citing *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc)). "The cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error," and we consider factors such as: (1) "the nature and number of the errors committed;" (2) "their interrelationship, if any, and combined effect;" (3) "how the district court dealt with

the errors as they arose (including the efficacy—or lack of effi-
cacy—of any remedial efforts);" (4) "the strength of the govern-
ment's case[;]" and (5) "the length of trial." *Id.* (citations omitted).

There are not, however, any guilt-phase errors to aggregate
unrelated to the Count 1 RICO conspiracy charge.  The district
court's wrongful sequestration of Ms. Bryant could have only been
prejudicial for purposes of the RICO conspiracy, as she was going
to dispute Mr. Coakley's testimony that Mr. Glass murdered Mr.
Johnson.  *See* D.E. 193 at 6, 8 (indictment charging that the racket-
eering activity included murder).  And the exclusion of Dr. de la
Cruz also went to the Count 1 convictions.  We are already setting
aside the convictions on Count 1 due to the erroneous exclusion of
Dr. de la Cruz.  As for the possible errors in allowing improper Rule
702 opinions by Sgt. Kelly and Agent Perez on a couple of terms,
those opinions were far too insignificant to have any serious effect
on defendants' convictions.

## IX. Sentencing

Having concluded our review of the errors alleged by the
defendants before and during trial, we reach the sentencing phase
of the case.  As a general matter, we review the application or in-
terpretation of the Sentencing Guidelines *de novo* and findings of
fact for clear error.  *See United States v. Grant*, 397 F.3d 1330, 1332
(11th Cir. 2005).[29]

---

[29] Before beginning our analysis, we note that at times the district court did
not explicitly make specific factual findings that underpin its sentencing

## A. BASE OFFENSE LEVEL FOR THE RICO CONSPIRACY

We start with Curtis Bryant and Jerimaine Bryant, who challenge the district court's calculation of their base offense levels for their Count 1 RICO convictions. The base offense level for a RICO violation is 19 or "the offense level applicable to the underlying racketeering activity," whichever is greater. *See* U.S.S.G. § 2E1.1(a). Here, one of the underlying racketeering offenses was premeditated murder, *see* D.E. 193 at 6, 8, and the government proved the murders of Mr. Hallman and Mr. Johnson at trial. *See* D.E. 1205 at 27–30; D.E. 1206 at 174–77; D.E. 1207 at 30–33, 165–68; D.E. 1213 at 18–22, 43–49. Accordingly, for each defendant the district court calculated a base offense level of 43 based on the underlying predicate offense of murder, pursuant to U.S.S.G. § 2A1.1.[30]

The base offense level for Curtis Bryant stemmed from the murder of Mr. Hallman. He first argues that he did not commit murder because he was acting in defense of his associate, Anthony Nixon. Under Florida law, a person is justified in using deadly force if he reasonably believes that using such force "is necessary to prevent imminent death or great bodily harm to . . . another[.]" Fla.

---

decisions. This lack of specific findings is not fatal where, as here, "it is clear from the record what evidence the court credited in making" its sentencing decisions. *See United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011).

[30] We address the challenges to the Count 1 base offense level in case the murders of Mr. Hallman and Mr. Johnson are relevant to the resentencing of Curtis Bryant and Jerimaine Bryant and the government chooses not to retry Count 1.

Stat. § 776.012(2) (2021). The determination of whether the force is justified is an "objective evaluation" of the conduct of the person "based on the circumstances as they appeared to [him] at the time of the altercation[.]" *Bouie v. State*, 292 So. 3d 471, 481 (Fla. 2d DCA 2020).

The district court's determination that Curtis Bryant murdered Mr. Hallman is a finding of fact subject to clear error review. *See United States v. Crawford*, 906 F.2d 1531, 1535–36 (11th Cir. 1990) (district court's finding that the defendant attempted to commit murder constituted a factual finding reviewed for clear error). Curtis Bryant cannot show that the district court's finding constituted clear error. The parties agree that shortly before Curtis Bryant shot him, Mr. Hallman had shot (and struck) Mr. Nixon, who was 15 years old at the time. But according to Ms. Houser, Curtis Bryant did not emerge from his house with a gun in his hand until after Mr. Hallman had shot Mr. Nixon and fled the scene. Consistent with this testimony, the medical examiner concluded that Mr. Hallman had been shot in the back. Jerimaine Bryant lauded Curtis Bryant for the shooting, and the following day Curtis Bryant himself bragged that Mr. Hallman "didn't even see it coming." D.E. 1229 at 145. Given this evidence, the district court did not clearly err in finding for purposes of sentencing that Curtis Bryant had committed murder under Florida law.

Curtis Bryant next argues that he lacked premeditation when he killed Mr. Hallman. Under Florida law, premeditation may form "a moment before the act" so long as there is "a sufficient

length of time to permit reflection as to the nature of the act[.]" *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 464 (11th Cir. 2015) (quoting *Kocaker v. State*, 119 So. 3d 1214, 1226 (Fla. 2013)). "Whether [a] defendant committed or attempted a murder with premeditation is a question of fact." *United States v. Henry*, 106 F.4th 763, 769 (8th Cir. 2024) (citation and internal quotation marks committed). The district court did not clearly err in finding that Curtis Bryant committed premediated murder by emerging from the house with his gun and shooting Mr. Hallman in the back while he was fleeing.

Jerimaine Bryant contends that the district court plainly erred in using U.S.S.G. § 2A1.1(a) to calculate his base offense level because he did not participate in a murder. It is well established, however, that a RICO conspirator may be held accountable for his co-conspirator's actions if they were reasonably foreseeable and in furtherance of the conspiracy, even if he did not personally participate in those actions. *See United States v. Bradley*, 644 F.3d 1213, 1297 (11th Cir. 2011). *See also* U.S.S.G. § 1B1.3(a)(1)(B) (stating that when an offense involves "jointly undertaken criminal activity," relevant conduct includes "all acts and omissions of others that were . . . in furtherance that criminal activity and reasonably foreseeable in connection with that criminal activity").

There is no claim by Jerimaine Bryant that Mr. Johnson's murder was not reasonably foreseeable or not in furtherance of the conspiracy. Given Mr. Grimes' testimony that Jerimaine Bryant urged Mr. Glass to murder Mr. Johnson, the district court did not

plainly err in calculating Jerimaine Bryant's base offense level for Count 1 under § 2A1.1(a).

## B. DRUG QUANTITY

Curtis Bryant and Messrs. Walker and Graham challenge, on several grounds, the district court's sentencing determination that they were responsible for between 2.8 and 8.4 kilograms of crack cocaine.  As explained below, we find no clear error in the district court's drug quantity attribution.  *See United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014) (stating that drug quantity attribution is subject to clear error review).[31]

The defendants' base offense level for Count 2 under the Sentencing Guidelines rested on drug type and quantity.  *See* U.S.S.G. § 2D1.1(a)(5), (c).  Where, as here, the amount of drugs seized did not reflect the scale of the narcotics offense, the district court had to estimate the quantity that was attributable.  *See Dixon*, 901 F.3d at 1349; U.S.S.G. § 2D1.1, cmt. n.5.

"In estimating the quantity, the [district] court may rely on evidence demonstrating the average frequency and amount of a defendant's drug sales over a given period of time."  *Reeves*, 742 F.3d at 506.  "This determination may be based on fair, accurate, and conservative estimates of the drug quantity attributable to a

---

[31] Numerous other defendants attempt to adopt the challenges of Mr. Walker, Curtis Bryant, and Mr. Graham to the district court's drug quantity attribution.  But this is a fact-specific, individualized issue that cannot be adopted without independent briefing.  *See, e.g., Khoury*, 901 F.2d at 963 n.13.

defendant, but it cannot be based on calculations of drug quantities that are merely speculative." *Id.* (alteration adopted) (quoting *United States v. Almedina*, 686 F.3d 1312, 1316 (11th Cir. 2012)). The government bears the burden of proving drug quantity by a preponderance of the evidence. *See id.*

The district court's overall drug quantity finding was not clearly erroneous. At trial, the government presented evidence that the Count 2 narcotics conspiracy, as alleged in the indictment, spanned from 2000 until 2017. Based on the testimony of Mr. Grimes and Mr. Coakley, the former DSBF members, the gang's estimated daily drug sales ranged from 14 to 28 grams of crack cocaine from 2000 until 2010. After 2010, daily drug sales peaked at 42 grams until mid-2013. Eventually, drug sales dwindled to seven grams per week by 2016.

Taking the lowest estimated figures for daily sales based on this testimony, the DSBF sold at least five kilograms of crack cocaine per year from 2000 through mid-2013, and 364 grams per year in the less successful period that followed. And it sold the drugs out of a common location, the South Gwen Cherry complex, rendering the group's total sales foreseeable to Curtis Bryant and Messrs. Walker and Graham, all of whom participated in and were members of the drug conspiracy. On this record, the district court's overall finding of between 2.8 and 8.4 kilograms of crack

cocaine did not constitute clear error. *See Almedina*, 686 F.3d at 1315.[32]

The defendants next challenge the district court's calculation by focusing on the timing of their affiliation with the DSBF. We discuss each one separately.

Reasonable foreseeability is not enough to attribute a quantity of drugs to a defendant who was a member of a narcotics conspiracy. In "the case of a jointly undertaken criminal activity," a defendant is responsible for "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). *See United States v. Reese*, 67 F.3d 902, 907 (11th Cir. 1995) ("[D]efendants are only accountable for other conduct that was reasonably foreseeable *and* within the scope of the criminal activity that the defendant agreed to undertake.").

Mr. Walker argues that his "involvement began with his arrest on January 30, 2015, and concluded with the return of the indictment on May 5, 2017," such that he was only accountable for 824 grams of crack cocaine. *See* M. Walker Reply Br. at 25. The government, however, established by a preponderance of the

---

[32] At 14 grams per day over 365 days, the estimated per-year sum from 2000 through mid-2013 was 5.1 kilograms, or over 60 kilograms in total for that period. At seven grams per week over 52 weeks, the estimated per-year total from mid-2013 to 2017 was 364 grams, or over one kilogram in total. The district court's calculation was well below these numbers.

evidence that Mr. Walker joined the conspiracy as early as July of 2012, when he began self-identifying with the DSBF on social media. He downplays this self-identification as "innocuous expressions," *see id*. at 24, but outsiders were subject to violence for falsely claiming membership. And he cannot fault the district court's consideration of the testimony from Mr. Coakley and Mr. Grimes, as it "was entitled to rely on the cooperators' testimony." *Dixon*, 901 F.3d at 1349.

Holding Mr. Walker accountable for at least 2.8 kilograms of crack cocaine was not clearly erroneous. During the first several years that he was associated with DSBF, a conservative estimate of the group's total sales was over five kilograms per year.

Curtis Bryant asserts that he should not be held accountable for crack cocaine sold during the three years he spent in prison after joining the DSBF in 2010. The evidence, however, showed that he joined the narcotics conspiracy as early as 2010 and, other than his self-serving assertion to the contrary, he provided no evidence to establish that he withdrew from the conspiracy when he went to prison.

For purposes of the Sentencing Guidelines, a defendant generally has the burden of proving his affirmative withdrawal from a conspiracy. *See United States v. Young*, 39 F.3d 1561, 1570 (11th Cir. 1994) (discussing a defendant's contention of withdrawal before the Sentencing Guidelines went into effect). "Neither arrest nor incarceration automatically triggers withdrawal from a conspiracy," *Richardson*, 532 F.3d at 1285 n.1 (citation omitted), and the district

court explained as much: "The fact that [Curtis Bryant was] in jail doesn't mean he's not part of the conspiracy." D.E. 1252 at 18. *See also United States v. Dabbs*, 134 F.3d 1071, 1083 (11th Cir. 1998) (holding that a defendant was accountable at sentencing for losses within the scope of the conspiracy because he did not establish his withdrawal).

In response, Curtis Bryant counters that the district court "never made individualized findings." C. Bryant Reply Br. at 18. But it expressly overruled his objection, which mirrored the present argument on appeal, and found that the amount attributable to him was "conservatively estimated." D.E. 1252 at 19, 27. We see no clear error in its finding. *See United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) ("[W]e and other federal appellate courts have inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated.").

Mr. Graham contends that his involvement spanned from 2012 until 2017, and therefore he was only theoretically responsible for 2.4 kilograms of crack cocaine. This timespan, he posits, equated to 29% of the conspiracy's duration, such that he should only be held responsible for 29% of the total amount the court attributed to him. His argument misses the mark.

For starters, the DSBF's yearly sales from 2012 to 2017 were variable and not static, so a raw, percentage-based calculation ((time involved in the conspiracy ÷ the total length of the conspiracy) x total drug quantity) does not accurately represent the

amount sold over a given timeframe. And for at least the first year and a half of Mr. Graham's professed involvement, the government established by a preponderance of the evidence that the sales exceeded five kilograms per year, easily satisfying the amount the district court attributed to him. The district court did not clearly err in finding Mr. Graham responsible for between 2.8 and 8.4 kilograms of crack cocaine.

## C. POSSESSION OF A FIREARM

Messrs. Walker and Graham contend that the district court erred in applying a two-level enhancement for possession of a firearm in connection with a narcotics offense. *See* U.S.S.G. § 2D1.1(b)(1). They argue, in part, that the enhancement should not apply because the evidence was insufficient to show that they personally possessed a firearm.[33]

---

[33] Messrs. Walker and Graham note that the jury acquitted them of their substantive charges of possession of a firearm in furtherance of a drug trafficking crime, but acknowledge that, under our precedent, a district court may consider acquitted conduct in calculating their sentences. *See United States v. Hamaker,* 455 F.3d 1316, 1336 (11th Cir. 2006). They nevertheless raise the issue to preserve it for appeal. Because "[o]ne panel of this Circuit cannot overrule another panel's decision," *United States v. Rushin*, 844 F.3d 933, 942 (11th Cir. 2016) (citation omitted), we reject the defendants' acquitted-conduct argument.

In closing, we note that the Sentencing Commission has enacted an amendment to U.S.S.G. § 1B1.3 that limits the use of "acquitted conduct" at sentencing. *See* U.S. Sentencing Commission Adopted Amendments to the Sentencing Guidelines (Apr. 17, 2024). The amendment will go into effect on November 1, 2024, unless Congress disapproves it.

### 1. GENERAL PRINCIPLES

The Sentencing Guidelines provide for a two-level sentence enhancement "[i]f a dangerous weapon (including a firearm) was possessed[.]"   U.S.S.G.   §   2D1.1(b)(1).   The commentary for § 2D1.1(b)(1) provides that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  § 2D1.1(b)(1),   cmt. n.11(A). "We review 'the district court's findings of fact under § 2D1.1(b)(1) for clear error, and the application of the Sentencing Guidelines to those facts *de novo*.'"  *United States v. Pham*, 463 F.3d 1239, 1245 (11th Cir. 2006) (citing *United States v. Gallo*, 195 F.3d 1278, 1280 (11th Cir. 1999)).

The government bears the initial burden of showing by a preponderance of the evidence that a firearm was present at the site of the charged conduct or that the defendant possessed a firearm during conduct related to the offense of conviction.  *See United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006).  Proximity between guns and drugs alone is sufficient for the government to meet that initial burden.  *See United States v. Carillo-Ayala*, 713 F.3d 82, 91–92 (11th Cir. 2013).  If the government meets its initial burden, "the evidentiary burden shifts to the defendant, who must demonstrate that a connection between the weapon and the offense was 'clearly improbable.'"  *Stallings*, 463 F.3d at 1220 (quoting *United States v. Audain*, 254 F.3d 1286, 1289 (11th Cir. 2001)).

A firearm enhancement may also apply to a defendant when the firearm is possessed by a co-conspirator.  *See Pham*, 463 F.3d at

1245.  In that situation, the government must show that "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." *Id.*

### 2.  MESSRS. WALKER AND GRAHAM

As to Mr. Walker, the evidence was sufficient to support the application of the firearm enhancement.  Specifically, Sgt. Kelly testified that she and another officer observed Mr. Walker during a controlled drug buy in January of 2015.  When one officer noticed Mr. Walker with a gun, the authorities moved in and a chase ensued, leading into an apartment where Sgt. Kelly saw Mr. Walker toss the gun into the kitchen sink before he was apprehended.  A search of the apartment revealed a second gun, small bags of marijuana, and money.  This apartment belonged to Mr. Walker's grandmother, but it was where he was "staying." D.E. 1203 at 97–98, 101.

Mr. Walker argues that Sgt. Kelly's testimony is insufficient to show either that he possessed the firearm during the transaction or that he was the person who sold the drugs.  But it is enough that the firearms were present at the site of the charged conduct.  *See Carillo-Ayala*, 713 F.3d at 90.  And Mr. Walker cannot show that it was "clearly improbable" that the firearms were connected to the drugs, which were in close proximity to each other.  *See id.  See also United States v. Hall*, 46 F.3d 62, 63–64 (11th Cir. 1995) (affirming

application of a firearm enhancement where a handgun was found in the same room with other drug paraphernalia and cash).[34]

Turning to Mr. Graham, the district court explained at sentencing that it was applying the enhancement because firearms were used during the DSBF's drug transactions at the South Gwen Cherry complex and, therefore, it was reasonably foreseeable to Mr. Graham that his co-conspirators would possess firearms during those transactions.  Mr. Graham, however, abandoned on appeal any challenge to the application of the firearm enhancement on that ground. We therefore affirm the application of the enhancement. *See Sapuppo*, 739 F.3d at 680.

But even putting abandonment aside, the record shows that Messrs. Graham and Walker communicated about drug trafficking activities and exchanging guns.  Mr. Graham also was present at the controlled buy in January of 2015.  The record therefore supports a finding that Mr. Walker's firearm possession was reasonably foreseeable to Mr. Graham and part of the jointly-undertaken criminal activity.   We therefore conclude that the district court did not clearly err in applying the firearm enhancement to Mr. Graham.

### D. USE OF VIOLENCE

---

[34] Curtis Bryant purports to adopt Mr. Walker's argument on this issue.  But he cannot do so because the application of the firearm enhancement is a fact-specific inquiry for a defendant, and therefore requires independent briefing. *See, e.g., Khoury*, 901 F.2d at 963 n.13.

Jerimaine Bryant and Messrs. Walker, Graham, and Jones challenge the district court's application of a two-level enhancement based on its findings that each defendant "used violence, made a credible threat to use violence, or directed the use of violence[.]" U.S.S.G. § 2D1.1(b)(2). The district court applied the enhancement to each defendant based on separate violent threats or incidents.

We review the district court's findings of fact under the use-of-violence enhancement for clear error and its application of the Sentencing Guidelines *de novo*. *See United States v. Yuk*, 885 F.3d 57, 82 (2d Cir. 2018); *Pham*, 463 F.3d at 1245. We discuss each defendant and his respective incident of violence.[35]

The district court applied the use-of-violence enhancement to Jerimaine Bryant because he struck a community member in the head with a boot for speaking with the police. Bryant does not contend that the district court clearly erred in basing the enhancement on this incident. Instead, he focuses on his lack of

---

[35] Curtis Bryant attempts to adopt Mr. Walker's argument on this issue. But whether a defendant used violence is an individualized factual inquiry that depends on his conduct. Curtis Bryant therefore cannot simply adopt Mr. Walker's argument on this point. *See, e.g., Khoury,* 901 F.2d at 963 n.13. *Cf. United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (stating that sufficiency-of-the-evidence arguments are "too individualized to be generally adopted"). This is especially so where, as here, the district court applied the enhancements to each defendant based on separate violent incidents. *Compare* D.E. 1246 at 19 (applying the enhancement to Mr. Walker based on social media activity), *with* D.E. 1252 at 23–26 (applying the enhancement to Curtis Bryant based on his participation in a murder).

participation in *other* violent acts.  This argument is insufficient to disturb the district court's determination.  A single incident of violence is enough.  *See United States v. Barronette*, 46 F.4th 177, 209 (4th Cir. 2022) (affirming the application of the use-of-violence enhancement based on a threat to hit a person in the head).

With respect to Mr. Walker, the district court applied the use-of-violence enhancement after considering social media evidence. Following an incident where some rivals "tr[ie]d to jump [another DSBF member]," Mr. Walker posted a request for a "[gun] we can use to spook them n****s out with we know [where] they be at." Gov't Exh. 317 at BSN 7865; D.E. 1246 at 19–20.  The district court determined that Mr. Walker's request for a firearm to "spook" others was a credible threat of violence sufficient to satisfy § 2D1.1(b)(2).  This finding was not clearly erroneous.  *See United States v. Sykes*, 854 F.3d 457, 460–61 (8th Cir. 2017) (upholding the application of the use-of-violence enhancement based on a defendant's statement to a confidential source that he would find and kill the thief who stole drugs from him).

For Mr. Graham, the district court applied the use-of-violence enhancement based on testimony from Mr. Coakley that he and Mr. Graham robbed a Metro PCS store together and that Mr. Graham was the one brandishing a firearm.  *See* D.E. 1250 at 5–6. Mr. Graham argues that Mr. Coakley's testimony regarding the robbery was unreliable because he initially told the authorities that they rode bikes to the Metro PCS store, whereas at trial he testified that they drove to the store in a car.  According to Mr. Graham, this

inconsistency shows that the government failed to prove that he robbed the store by a preponderance of evidence.

We reject Mr. Graham's argument. The district court could have disbelieved Mr. Coakley about Mr. Graham's brandishing of the gun, but it was not required to. Moreover, Mr. Graham could have brought a gun to the robbery regardless of how he and Mr. Coakley traveled to get to the Metro PCS store. Because we defer to the district court's credibility determinations, this inconsistency is not enough to render its finding clearly erroneous. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("[T]he fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.").

The district court applied the use-of-violence enhancement to Mr. Jones based on his involvement in the narcotics conspiracy; it found that he was "on notice that this was a violent group" and worked together with others who robbed a rival drug dealer. *See* D.E. 1260 at 15–16, 25–26. The government concedes that Mr. Jones did not personally use violence or make threats but contends that the fact that the co-conspirators brought the spoils of the robbery to Mr. Jones supports an inference that he directed or encouraged their violence. We disagree with the government.

The Sentencing Guidelines allow for the application of an enhancement based on the actions of a defendant's co-conspirators if those acts are reasonably foreseeable and within the scope of jointly-undertaken criminal activity, but only "in the absence of

more explicit instructions in the context of a specific guideline[.]"
U.S.S.G. § 1B1.3, cmt. background. The language of the use-of-vi-
olence enhancement provides the required explicit instructions
here by framing the inquiry on whether *"the defendant* used vio-
lence, made a credible threat to use violence, or directed the use of
violence[.]" U.S.S.G. § 2D1.1(b)(2) (emphasis added). Unlike other
guideline provisions, § 2D1.1(b)(2) does not ask whether "violence
was used" or whether "the offense involved violence."[36]

Based on the language of § 2D1.1(b)(2), we must focus on
Mr. Jones' own conduct. Absent any use or threatened use of vio-
lence by Mr. Jones, or his directing the use of violence, the district
court could not base this enhancement on the actions of co-con-
spirators. *See United States v. Hernandez-Barajas*, 71 F.4th 1104,
1107–08 (8th Cir. 2023) (holding that directing the use of violence
requires that the violence be a "reasonably foreseeable" conse-
quence of the defendant's affirmative acts, and compiling cases to
that effect).

The evidence was insufficient to sustain the use-of-violence
enhancement as to Mr. Jones. All we have is the government's bare
assertion that the delivery of the drugs to Mr. Jones, without more,
evinced his direction of the violence. Although the presentence
investigation report stated that Mr. Jones was known as "the weed
man" and that he was involved in resale of the drugs after the

---

[36] A number of other enhancements in the Sentencing Guidelines focus on the
offense and not the defendant's own actions. *See, e.g.,* U.S.S.G. §§ 2A3.2(c),
2B1.1(b)(11), 2D1.1(b)(1), 2H2.1(a)(1).

robbers delivered the marijuana, *see* D.E. 868 ¶¶ 67, 80 & D.E. 1213 at 36, his role as a seller of stolen narcotics does not alone serve as an open invitation for others to bring him the proceeds of their violent conduct. Without some evidence of such an arrangement, this is an evidentiary bridge too far. That is to say, the use-of-violence by others was not a reasonably foreseeable consequence of Mr. Jones' own acts. *See Hernandez-Barajas*, 71 F.4th at 1107–08. We therefore conclude that the district court clearly erred in its application of the two-level use-of-violence enhancement to Mr. Jones. We vacate his sentence and remand for resentencing.

### E. Obstruction of Justice

Jerimaine Bryant and Mr. Hayes challenge the district court's imposition of a two-level enhancement for obstruction of justice. "Whether the district court properly applied the obstruction of justice enhancement is a mixed question of law and fact." *United States v. Johnson*, 980 F.3d 1364, 1374 (11th Cir. 2020) (citation omitted).

The Sentencing Guidelines provide for a two-level enhancement for obstruction of justice if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]" U.S.S.G. § 3C1.1. The enhancement is appropriate when a defendant "threaten[s], intimidat[es], or otherwise unlawfully influenc[es]

a co-defendant, witness, or juror, directly or indirectly, or attempt[s] to do so[.]"  § 3C1.1, cmt. n.4(A).

### 1. JERIMAINE BRYANT

We begin with Jerimaine Bryant.  According to the presentence investigation report, in November of 2010 he struck a witness, Shakita Frank, "in retaliation for her cooperation with the law enforcement investigation."  D.E. 915 ¶ 27.[37]

Jerimaine Bryant argues that, looking to the four corners of the report, there was no evidence that his alleged conduct curtailed or frustrated Ms. Frank's cooperation with the authorities.  He further says that "[t]he cooperation had already occurred and there [was] no evidence that it hindered or was designed to hinder future cooperation since Ms. Frank did not testify at trial or at sentencing as to the veracity of this 2010 allegation."  J. Bryant's Br. at 42.

This argument fails.  After all, § 3C1.1(1) includes an "attempt[ ]" to obstruct or impede.  So the fact that the attack on Ms. Frank did not have its desired effect did not preclude application of the enhancement.  *See United States v. Hesser*, 800 F.3d 1310, 1330–32 (11th Cir. 2015) (upholding enhancement for attempted witness intimidation); *United States v. Fleming*, 667 F.3d 1098, 1110–11 (10th Cir. 2011) ("[H]is request that Michelle tell Ms. Scott 'not to be

---

[37] During trial, Ms. Houser testified as follows: "Q: What did you talk to Quincy about?  A: I asked him why Jerimaine beat [Ms. Frank] with a [Timberland] boot.  He said she talk too fucking much, and she was trying to talk to the First 48. . . . Q: What is First 48, when you say that?  A: The homicide detectives."  D.E. 1213 at 51–52.

talking to anybody about this shit' constituted an attempt to threaten or influence Ms. Scott and satisfied the substantial step requirement.").

## 2. Mr. Hayes

Next, we consider Mr. Hayes' obstruction-of-justice enhancement. According to the presentence investigation report, in February of 2017 Mr. Hayes physically assaulted Donzell Jones at the Federal Detention Center in Miami because of the latter's co-operation with the government. *See* D.E. 868 ¶ 81. Mr. Jones testified about this incident at trial, explaining that following the incident he did not cooperate any further. D.E. 1114 at 46.

Mr. Hayes argues that Mr. Jones' testimony was Rule 404(b) "other act" evidence that was never noticed by the government, was not relevant to the issues raised in the indictment, and was therefore inadmissible. But "it's well established that [i]n determining the relevant facts, sentencing [courts] are not restricted to information that would be admissible at trial." *United States v. Baptiste*, 935 F.3d 1304, 1315 (11th Cir. 2019) (citation and internal quotation marks omitted). We have explained in similar circumstances that otherwise inadmissible evidence "is fair game" as part of a district court's sentencing calculus "provided that the information has sufficient indicia of reliability to support its probable accuracy." *Id.* (quoting U.S.S.G. § 6A1.3).

Significantly, Mr. Hayes does not challenge the reliability of Mr. Jones' testimony. The closest he comes is his assertion that the "tussle" was a "mere coincidence" when compared to the timing

of Mr. Jones' cooperation. *See* S. Hayes Br. at 51. But this simply challenges the inferences that can be drawn from the evidence, and not the reliability of the testimony itself. Indeed, Mr. Hayes notes in his reply brief that "the present record . . . allows an inference based on the pure coincidence that [Mr.] Hayes and [Mr.] Jones fought at a time subsequent to [Mr.] Jones'[ ] decision to cooperate." This does not bear on reliability.

The district court did not err in applying the obstruction enhancement to Mr. Hayes based on his assault of Donzell Jones.

## F. DISPARATE SENTENCES

Mr. Graham argues that the district court acted unreasonably in sentencing him to imprisonment for 60 more months than Mr. Ingram for similar crimes. According to Mr. Graham, Mr. Ingram received a lighter sentence despite playing a larger role in the drug conspiracy, participating in the conspiracy for a longer time, and having a prior criminal record.

We review the reasonableness of a sentence (both procedurally and substantively) for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 56 (2007). At sentencing, district courts must consider, among other things, "the need to avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6) (emphasis added). But "[d]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *United States v. Regueiro*, 240 F.3d 1321, 1325–26 (11th Cir. 2001). And defendants convicted of different offenses, or subject to

different advisory guideline ranges, are not "similarly situated" for the purpose of considering sentencing disparities. *See United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015).

Messrs. Ingram and Graham were not "similarly situated" defendants for purposes of sentencing. Mr. Ingram was found guilty of two drug-related charges and acquitted of the RICO conspiracy charge, whereas Mr. Graham was found guilty of two drug-related charges *and* the RICO conspiracy charge. *See* D.E. 735; D.E. 732. Mr. Graham also received a use-of-violence enhancement that Mr. Ingram did not. As a result, Mr. Graham had an advisory guidelines range of 235 to 293 months' imprisonment, compared to a range of 210 to 262 months' imprisonment for Mr. Ingram. Both received below-guidelines sentences—228 months for Mr. Graham and 168 months for Mr. Ingram.

In short, Mr. Graham was found guilty of a more serious crime, and received an additional enhancement, and as a result he received a longer sentence. *See Azmat*, 805 F.3d at 1048 ("Defendants convicted of more crimes or more serious offenses naturally receive longer prison sentences[.]"). Given their different convictions and circumstances, we cannot say that the district court abused its discretion in sentencing Mr. Graham to 60 more months than Mr. Ingram.

### G. THE LIFE IMPRISONMENT SENTENCES OF MR. GLASS AND JERIMAINE BRYANT

Mr. Glass and Jerimaine Bryant argue challenge their life imprisonment sentences on various grounds. Because both

defendants were convicted of the Count 1 RICO conspiracy charge, and because we have set aside the Count 1 convictions and sentences, we do not address the life imprisonment sentences.

### X. Conclusion

We set aside the convictions and sentences of Jerimaine Bryant, Curtis Bryant, Mr. Graham, Mr. Walker, Mr. Hayes, and Mr. Glass on the Count 1 RICO conspiracy charge, and remand for a new trial if the government chooses to retry these six defendants. If the government does not wish to retry the defendants on Count 1, the district court will need to resentence them.

We also vacate Mr. Jones' sentence due to the improper application of the use-of-violence enhancement and remand for resentencing.

In all other respects, we affirm the defendants' convictions and sentences.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

BRASHER, Circuit Judge, concurring in part and dissenting in part:

I concur with almost all the majority opinion, but I dissent from Part V and its necessary implications for other portions of the opinion. The majority concludes in Part V that the district court abused its discretion by excluding defense expert Dr. de la Cruz's testimony. I disagree.

The government charged the defendants with a conspiracy to commit racketeering through "any enterprise" engaged in or affecting interstate commerce. *See* 18 U.S.C. § 1962(d). Dr. de la Cruz proposed to testify that he had "studied a criminal enterprise, what it does, how it works, [and that the defendants' conduct] does not equal this"; the defendants argued that "regardless of the labeling one way or another . . . that is the crux of the testimony which should go to the jury." The district court explained that a problem with this proposed testimony was "his criteria" in making his assessment: "that [enterprises] don't have rules, that they don't do this, that real . . . criminal enterprises don't shoot themselves." Without citing any specific portion of Fed. R. Evid. 702, the district court surmised: "I certainly don't think it is the subject of expert testimony[.]"

I think the district court was right. Dr. de la Cruz didn't take the legal definition of "enterprise" as a given and discuss how that definition applied to the facts of this case; he made up his own legal definition of enterprise and planned to tell the jury to apply that definition. The district court was correct in excluding Dr. de la Cruz's testimony, because an expert "'may not testify to the legal

implications of conduct.'" *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)). Instead, the *court* must be the jury's only source of law. *Montgomery*, 898 F.2d at 1541. When an expert witness offers legal conclusions, he "invade[s] the court's exclusive prerogative" and "risk[s] confusing" the jury. *Commodores*, 879 F.3d at 1129. So, a district court must take "adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion." *Id.* (quoting *United States v. Herring*, 955 F.2d 703, 709 (11th Cir. 1992)).

Dr. de la Cruz's proffered testimony was fraught with legal opinions about what makes an "enterprise." The "crux" of his proposed testimony was his "criteria" for assessing whether a group is a criminal enterprise, which differ from the actual legal definition of the term. Specifically, he laid out "universal" characteristics of a "criminal enterprise" and then applied those idiosyncratic criteria to the question of whether the "people in this case constitute a criminal enterprise[.]" For instance, he testified that criminal enterprises "all have a leader," "all commit crimes for the benefit of the organization," "don't allow [members] to use drugs" because "you can't make money for the organization if you're smoking it up," and universally do not permit members to "assault or kill an individual from [their own] organization . . . without permission[.]" When explaining why he thought no such enterprise existed "in this case," he testified that the defendants had "no leadership direction," and that criminal enterprises have "certain rules" including that "you don't use the drugs that you sell for the

organization[.]" A juror could reasonably construe Dr. de la Cruz's testimony as providing definitional criteria for a RICO enterprise—indeed, there is no other way to understand it.

The problem is that the definition of a RICO enterprise within the meaning of 18 U.S.C. § 1962(d) is a question of law. *See generally Ruiz v. United States AG*, 73 F.4th 852, 855–56 (11th Cir. 2023) (an argument "about the meaning of a statutory . . . provision [ ] presents a quintessential question of law." (citation and internal quotation marks omitted)); *United States v. Chinchilla*, 987 F.3d 1303, 1306 (11th Cir. 2021) ("The interpretation of a criminal statute is a legal question we review *de novo*."). And as the majority indicates, the Supreme Court has spoken on that legal question by setting out "structural features" of a RICO association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). By setting out his own "universal" structural features of an enterprise—e.g., leadership, crimes committed for the organization's benefit, rules against using drugs meant to be sold—Dr. de la Cruz's testimony would have risked confusing the jury over the meaning of a statutory term and invaded the district court's exclusive prerogative to state the law. *See Commodores*, 879 F.3d at 1129.

The majority says that Dr. de la Cruz's testimony was not improper legal testimony by pointing to the Third Circuit's proposition that the "existence *vel non* of a RICO enterprise is a question of fact for the jury." *United States v. Console*, 13 F.3d 641, 650 (3rd

Cir. 1993). This proposition is true, the majority emphasizes, even though a RICO enterprise has a legal definition. I don't disagree. But Dr. de la Cruz did not testify only as to whether a RICO enterprise existed. Nor was he asked whether the defendants exhibited the structural RICO enterprise features the Supreme Court set out in *Boyle*, 556 U.S. at 946. Instead, as explained above, he spent the bulk of his testimony providing his own legal definition of "enterprise" by presenting his own set of structural features that are supposedly "universal" to criminal enterprises. In other words, his testimony was improper legal opinion because its crux was to provide the jury his own idiosyncratic definition of a statutory term.

In any event, I can't say the district court abused its discretion in excluding this testimony. "The abuse of discretion standard allows for a range of choice, and that means that sometimes we will affirm even though we might have decided the matter differently in the first instance." *Doe v. Rollins Coll.*, 77 F.4th 1340, 1347 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1056 (2024). Because Dr. de la Cruz's testimony offered improper legal opinions on the standard to evaluate whether a RICO enterprise exists, the district court reasonably prevented him from testifying. *See Commodores*, 879 F.3d at 1128–29. So I respectfully concur in part and dissent in part from the majority opinion.